**CITGO REFINING AND MARKET- ING, INC., and Citgo Petroleum Corporation, Appellants,**

v.

**Amelia GARZA, et al., Appellees.**

**No. 13–03–267–CV.**

Court of Appeals of Texas, Corpus Christi–Edinburg.

Sept. 30, 2005.

Opinion on Rehearing March 23, 2006.

See also 979 S.W.2d 318 and 94 S.W.3d 322.

Jeffrey K. Sherwood, Akin, Gump, Strauss, Hauer & Feld, Washington, DC, J. Stephen Barrick, Akin, Gump, Strauss, Hauer & Feld, Houston, Frank E. Weathered, Dunn & Weathered, Corpus Christi, for Appellants.

Shari A. Wright, Dennis Craig Reich, Reich & Binstock, H. Lee Godfrey, Susman, Godfrey & Mcgowan, Houston, Steve T. Hastings, Law Office of Steve T. Hastings, Corpus Christi, for Appellees.

Before Justices HINOJOSA, YAÑEZ, and CASTILLO.

## OPINION

Opinion by Justice CASTILLO.

Appellant, Citgo Refining and Marketing, Inc. and Citgo Petroleum Corp. ("Cit-

go"), appeals from a final judgment finding breach of a settlement agreement. The underlying suit involves a class action against numerous defendants claiming damage to various parcels of real property and resulting diminution in value from airborne toxic contaminants. Appellees are representatives of the class and subclasses as originally certified by the trial court in an order dated November 14, 1995. Citgo (independent of other defendants) and appellees entered into a stand-alone settlement agreement in late September 1998. Appellees amended their pleadings to sue for breach of the settlement in March 2000. The parties tried the matter before the court in August 2001; an order finding breach issued October 17, 2001. A separate hearing on attorneys' fees was held in February 2002. In September 2002, the trial court held a hearing to determine fairness of the settlement agreement. Final judgment, finding the settlement to be fair, adequate and reasonable, and awarding damages in favor of appellees, issued April 4, 2003. This appeal ensued. We reverse and remand.

## Background

The underlying suit sought certification of a class of real property owners alleging nuisance, trespass, and negligence of various defendants, including Citgo, for damages and resulting diminution in property value based upon airborne contamination. The trial court held a hearing on the certification issues in October 1995. The trial court issued an order certifying the class on November 14, 1995, composed of various subclasses based upon location of a class member's property and its date of acquisition. Three classes were certified: (1) the I–37 North Residential Property Damage Class ("I–37 North Class") (composed of several subclasses based upon date of acquisition of the property); (2) the I–37 North Free Phase Hydrocarbon Property Damage Subclass (a subclass of the North Class, a/k/a the "Oak Park Triangle"); and (3) the I–37 South Residential Property Damage Class ("I–37 South Class") (composed of several subclasses based upon (a) geography in relation to Leopard Street and (b) date of acquisition of the property). The order certifying the class, in addition to identifying the various classes and subclasses, states: "The Court finds the Plaintiffs' have satisfied their burden of presenting some evidence that reasonable class definitions and other conditions of Rule 42 are satisfied with respect to the Plaintiffs proposed property damage classes."[1] Certification of the class was appealed and affirmed in August 1996. *See Amerada Hess Corp. v. Garza,* 973 S.W.2d 667, 671, 682 (Tex.App.-Corpus Christi 1996) ("Garza I"). The matter was further appealed to the Supreme Court, but dismissed for want of jurisdiction. *See Coastal Corp. v. Garza,* 979 S.W.2d 318 (Tex.1998).[2]

In September 1997, Citgo and appellees reached a settlement agreement, by which Citgo would pay $12,292,758.19 to buy back properties located in the Oak Park Triangle, pay $3.55 million to the balance of the I–37 North class, and pay $1.45 million for the I–37 South class. Attached to and incorporated as part of the settlement agreement are various exhibits including, among other things, a breakdown

---

1. The order also found class counsel qualified for service and rejected certification of any class for proposed medical monitoring.

2. Citgo argued that conflicts jurisdiction attached, because the court of appeals' decision conflicted with *RSR Corp. v. Hayes,* 673 S.W.2d 928 (Tex.App.-Dallas 1984, writ dism'd w.o.j.). The supreme court rejected that view, distinguishing *RSR. See Coastal Corp. v. Garza,* 979 S.W.2d 318, 319, 321–22 (Tex.1998).

of the valuation amount to be paid for each property in Oak Park (exhibit 3) and an Oak Park Protocol Agreement. The protocol agreement sets out that the offer for each parcel of property is based upon the adjusted assessed value of the parcel as of 1996, to which a factor is applied and other allowances are added. Exhibit 3 sets out the exact offer price for each parcel of property. The settlement called for all class representatives to sign the document no later than October 6, 1997.[3] The agreement sets forth various conditions which must be satisfied before it is effective, including approval by the trial court. The parties agreed to seek preliminary approval at the hearing scheduled for October 10, 1997; there are provisions to provide for a continuance in the event approval was denied. If no court approval was secured, Citgo had no obligation to pay under the agreement. The agreement recites that by signing, the claimants provided a full release and discharge, along with a covenant not to sue or institute other legal, equitable or administrative proceedings against the settling defendants.[4] The settlement is a stand-alone agreement between Citgo and the appellees, independent of any other settlements that might be reached with other defendants in the suit.

Appellees presented the settlement to the trial court for approval in October 1997. Plaintiffs' Motion for Preliminary Approval of Settlements and Approval of Notice actually requested approval not only of the Citgo settlement, but also of settlements with three other defendants, for a total of three separate settlement agreements. The motion reflects that the settlement with Citgo involves only release of property damage claims and any medical monitoring claims. The motion further states that "[a]s part of the settlement of CITGO, Class counsel and CITGO seek approval of a small additional class of all persons who own property in the Oak Park Areas, as of June 1, 1991 who have since sold such property.... This requires the creation of a small sub-class...." In conjunction with the other settlements, appellees noted they were also filing contemporaneously a request for certification of a Commercial Settlement Class.

At the hearing held October 10, 1997,[5] the trial court appointed a guardian ad litem to review the settlement and assist in determining its fairness to class members, expressing its concerns that dollars allotted for the Oak Park Triangle might be inadequate.[6] On October 31, 1997, the ad litem reported to the court that the settlement reflected monies paid to Oak Park property owners were calculated upon the

---

**3.** Of the 35 class representatives, 12 had signed the agreement by October 6, 1997; another 10 signed after that date. Thirteen never signed the settlement agreement.

**4.** The settlement is lengthy, and includes many other protective clauses, contingent upon the happening of various events. There are provisions to secure preliminary court approval, provide notice to and then secure releases from the entire class, and then obtain final approval from the court. There are escape provisions if a certain percentage of property owners elect to opt out of the class. There are provisions for the set up of accounts to be used for purchasing the proper-

ties, and making payments to class members. There are provisions for the payment of attorneys' fees.

**5.** On October 19, 1997, Citgo filed a response to plaintiffs' motion for preliminary approval, clarifying that Citgo's settlement agreement allocated monies to purchase properties "in connection with the payment of compensatory damages to Property owners and the payment for purchase of land in the Program Area," and noting that the Program Protocol Agreement included more detailed specifics.

**6.** The formal order issued October 14, 1997.

1996 assessed value. The ad litem discusses a "settlement proposal" which impliedly incorporates the other settlements, including those either under consideration or already executed with other defendants, since in addition to the Oak Park Triangle funds (which dollars exactly match the monies contemplated in Citgo's settlement), additional substantial sums totaling $17 million are discussed as part of the settlement.[7]

On November 6, 1997, Citgo filed its Memorandum in Support of Motion to Approve Preliminary Settlement Class. Citgo explained the basis for its position that the monies tendered for the Oak Park Triangle, as well as for remaining class members, were fair and adequate. Much of this memorandum directly addresses concerns of the court and others as expressed at the October 10 hearing. Attached to the memorandum are detailed materials reflecting how the property valuations were derived and calculated.

Appellees' counsel forwarded a letter to the trial court on November 7, 1997, stating that the "parties have continued their efforts to settle the class action." The correspondence notes that the guardian ad litem was assigned to review only the proposal for the Oak Park Triangle, that the plaintiff class included many additional property owners, and that any settlement must treat all class members equally.

In a supplemental letter to the court dated November 17, 1997, the ad litem stated his conclusion that "the initial settlement proposal should be modified to reflect a redistribution of the offered funds." Although he notes that the proposed modification would not require an increase in any settlement monies offered by the settling defendants, the ad litem treats the various agreements as though each is contingent upon and interconnected with the others. He contemplates an increase in monies allotted to the Oak Park Triangle, principally from a potential settlement between the class and Amerada Hess. Importantly, he criticizes the Oak Park Triangle portion of the settlement proposal (to which Citgo alone was contributing) because it utilized 1996 property appraisal values as a basis for calculation of offer price. He recommended specific "revisions" to the proposal.[8] He proposed that the settlement utilize an entirely different calculation to find a property value for the Oak Park Triangle, that persons owning single family residences as of September 29, 1997, receive an additional sum for each year they lived in their home, and a redistribution of monies allotted for attorneys' fees. He states that "no other settlement monies would be affected except for funds contributed in the future by [an as-yet unsettling defendant.]" He then states: "The suggested modifications to the initial settlement proposal are being presented to this Court after much consid-

7. Additional sums contemplated in Citgo's settlement totaled only $5 million.

8. The ad litem appears to reference all the settlements together as the "settlement proposal," and does not consider Citgo's settlement in isolation. In particular, he refers to the "initial settlement plan" as allotting $12,292,758.19 to the "Oak Park Triangle," with a "remaining $17.5 million" "proposed to be distributed as follows: $7.5 million ... to residents of Hillcrest and residents of the class area on the south side of Interstate 37

(again, under these proposed revisions these $7.6 million dollars would remain untouched), $7.4 million ... as requested attorneys' fees, and an additional $2 million was earmarked for reimbursement of attorneys' expenses." The sums referenced obviously exceed those addressed in the Citgo settlement agreement; however, only monies in the Citgo agreement are dedicated to the Oak Park Triangle and it is those monies that are challenged as inadequate.

eration ... The proposed revisions have been discussed with class representatives and have communicated to me as being acceptable on behalf of the class." There is no statement that the proposed modifications were acceptable to Citgo, or any acknowledgment that Citgo's settlement is independent of and not part of a larger package.

Appellees' counsel subsequently communicated with the trial court on November 25, stating they were "evaluating the increased cost" of the ad litem's recommendations. Appellees' counsel stated: "We are committed to accomplishing a 'global' resolution of the class action, and we cannot encourage the taking of money from some class members for the purpose of accomplishing the buy-out of Oakpark (to the detriment of the rest of the class members.).... We are also continuing our efforts for a 'global' resolution of the lawsuit." On December 3, 1997, appellees' counsel sent another letter to the trial court, summarizing settlements reached to date; five defendants had entered into settlements totaling $28.56 million for the Residential Class.[9] This communication to the court reflects the allocations as proposed in early October 1997, as well as modifications proposed by the guardian ad litem. Each of the two proposed modifications deal directly with funds for the Oak Park Triangle. Appellees' counsel addressed the proposals in light of the increased costs they generated, including perceived problems or issues if the suggestions were adopted exactly as proposed. They concluded: "While the current allocation of settlements is fair and reasonable to the entire class and should be preliminarily approved by this court, counsel would like the opportunity to discuss possible alternatives with the ad litem."

On December 11, 1997, a "revised offer" was tendered to the trial court. The transmitting letter reflects that attorneys for settling defendants, including Citgo, and class counsel had met "in an attempt to find a solution to the concerns expressed at the preliminary approval hearing." They had agreed to and recommended several adjustments to the plan to purchase properties in the Oak Park Triangle, increasing monies paid.[10] The letter noted: "The original buyout proposal was to be funded entirely by Citgo. In order to put additional funds into the Oak Park buyout, funds from other settling defendants must be and will be utilized. Therefore all of the proposed settlements must be accepted by the entire class (subject to opt in/out limits), or else there is no funding for the Oak Park buyout (a consequence of [the ad litem's] recommendations)." A proposed order which would approve settlement in accord with this letter was attached.

On December 12, 1997, the trial court issued a letter to counsel for appellees and to the guardian ad litem, rejecting the revised proposal since it would only allocate approximately $35,500 for each home in the Oak Park Triangle. "This Court therefore orders that each owner occupant of the Oak Park Triangle receive a minimum recovery of $50,000.00.... In addition, this Court is rejecting [the guardian ad litem's] proposal of $1,000.00 per year

9. Settlements had yet to be reached with three of the defendants; a fourth, Amerada Hess, had agreed "in principle" to a settlement. The letter notes that, at the time the Citgo settlement was negotiated, only three class representatives did not endorse it; however, other additional class representatives subsequently elected to withhold their endorsement.

10. Signed approvals to these revisions of fifteen of the class representatives are attached to that proposal.

per resident." None of the settlements were approved.

On January 8, 1998, appellees filed a Supplemental Motion for Preliminary Approval of Settlements, Conditional Certification of Settlement Classes, and Approval of Notice of Settlements.[11] Appellees referenced not only the earlier three settlement agreements, including the one with Citgo, but also two additional agreements. Included in the supplemental motion for preliminary approval is a request for "approval of three settlement classes:"

> The first is the Oak Park Settlement Class. It includes all persons who owned property zoned for single family residential use within the Oak Park area on June 1, 1991 or September 27, 1997. The second class is the Residential Settlement Class. It includes all persons who owned real property zoned for single family residential use within the Residential Area as of June 1, 1991. Class counsel seeks approval of these two classes as to claims against the Settling Defendants only and for settlement purposes only.

> In addition, as part of the settlements with Southwestern, Champlin, UPC, Hess, and OxyChem, these companies and Class Counsel request that the Court conditionally certify a Commercial Settlement Class of all persons who owned property as of June 1, 1991, other than property zoned single-family residential, within the Commercial Class Area.

The motion states that "Settling Defendants and the Class Members agree that each of these classes meets the criteria for certification under Rule 42."

There are distinctions between this proposal and that set forth in the Citgo settlement agreement beyond the redefinition of the classes. Citgo's Oak Park Protocol agreement provided for an "offer price" composed of an "adjusted assessed value of any improvements located on that land plus a premium payment equal to 85% of the adjusted assessed value of such land and improvements," based on the 1996 appraised values. Additionally, the Citgo agreement defined "owner occupant" as a person with title to property zoned single family residential in the program area "as of September 29, 1997." This new proposal called for payment to be made to those owning property as of June 1, 1991, in an amount equal to "185% of the highest appraised values, between 1989 and 1996," and "no person ... will receive an offer less than $45,500." Class members deciding to participate in the settlement "must sell their property to CITGO...." Appellees attached to their motion a proposed "Order Conditionally Certifying Settlement Classes, Preliminarily Approving Settlements and Form of Notice and Directing Notice to be Sent to the Settlement Class."

Attached to the supplemental motion for preliminary approval was a copy of a settlement agreement with Amerada Hess (although this agreement lacks any signatures by Amerada Hess). Also attached was a settlement agreement (executed) by yet another settling defendant. Each of these settlement documents sought "approval of three settlement classes"—those for which certification was requested in appellees' motion. The agreements are drafted accordingly. No addendum referencing a similar request with regard to the Citgo settlement is provided.[12] The

---

11. A draft copy of this document was forwarded to counsel on December 19, 1997.

12. The final attachments include three proposed notices to the three new settlement classes for which certification is sought.

settlement with Amerada Hess provided specifically that residents of the Oak Park Triangle "will receive 185% of the highest appraised values, between 1989 and 1996," and that no person owning such a property "will receive an offer less than $45,500.... Class members who decide to participate in the settlement must sell their property to Citgo for the stated price within one year." This settlement directs certain sums for distribution to the newly-defined Residential and Oak Park classes, but includes no indication as to how the monies will be allocated between those classes. Additional monies are designated for the newly-defined Commercial Class. The other settlement provides for monies to be contributed to the Residential and Commercial classes only. Each of these agreements calls for a distribution protocol to be developed after preliminary approval is given by the trial court.

At the time this proposal was submitted, Citgo's interlocutory appeal from the original class certification order was still pending before the Texas Supreme Court. Appellees' counsel forwarded a letter brief to the court asserting the court did nevertheless have jurisdiction to approve a settlement pending such an appeal, but did not address the proposal to certify differently-defined classes.[13]

On January 12, 1998, Citgo filed a Memorandum of Law in Opposition to Plaintiffs' Original and Supplemental Motions for Preliminary Approval of Settlement. In this document Citgo contended that (1) the court had no jurisdiction to alter definition of the plaintiff classes pending the interloc-utory appeal, and (2) Citgo had not consented to any revisions to its settlement agreement with members of the class, and its agreement did not comport to the proposal as submitted to the court. Citgo urged that its buy-out program was a "stand-alone deal," and, in particular, that the opt-out provisions in the new proposal differed substantially from those in Citgo's proposal, removing many of the protections Citgo had built in to its agreement. Citgo urged that in its agreement it was free to proceed with the Oak Park Triangle buy-out even if more than ten percent opted out of the settlement, but its decision to proceed under the new proposal could be controlled by other defendants. Secondly, Citgo urged that the separate opt-out provisions provided in Citgo's agreement were removed and now inextricably intertwined to acceptance of the settlement by the other classes. Citgo urged that while a trial court may suggest modifications to a settlement proposal, it may not adopt a settlement that has been modified absent the consent of all parties, and it certainly may not unilaterally impose modifications to an "agreed settlement" against the will of any party. A formal notice of objection was also filed by Citgo on January 12, 1998. Appellees urge that this memorandum in opposition to the supplemental motion for approval of the settlement agreements constituted the first instance of Citgo's breach, by which Citgo failed to adhere to its agreement to "work diligently and cooperatively to obtain the effectuation of the settlement embodied in this Settlement Agreement."[14]

---

13. On December 31, 1997, Citgo filed a motion with the supreme court requesting that it stay or abate further action on the pending appeal in light of the potential settlement. Citgo states this was an effort to preserve the trial court's jurisdiction which was subsequently withdrawn January 7, 1998.

14. Language in the agreement continues, by providing that all parties "agree to seek preliminary approval from the Court of the settlement embodied in this Settlement Agreement at the hearing scheduled for October 10, 1997, and in the event that hearing does not go forward, as promptly thereafter as the parties can be heard."

A hearing was held on the motion for preliminary approval on January 13, 1998. Counsel for appellees represented that the settlement with Amerada Hess had been finalized, but Amerada Hess's counsel clarified that it had not yet executed the agreement; it remained an agreement in principle. Citgo urged that its opposition was based first on the issue of jurisdiction, but secondly on the fact that the settlement agreement as presented—as a package deal—did not comport and in fact conflicted with the stand-alone agreement earlier executed by Citgo. Appellees countered, as they do here, that no changes to the Citgo agreement were envisioned; rather any issues arise from the integration of Citgo's settlement with the others to enhance the purchase prices for the Oak Park Triangle properties. Appellees' counsel conceded that the proposed settlement classes did differ from those earlier certified by the trial court:

"What other differences are there to show that they're not substantially the same? Well, they're different in terms of time. They cover different time periods, therefore, different people. They're different in terms of geography. They don't cover the same area physically that [the earlier certified classes] covered and they're different in scope because they cover a commercial class which [was not] certif[ied]."

Counsel for appellees urged that "[t]he settlement classes are completely apart from the validity of the certification order," and that by agreeing to settle each defendant did not have to agree with the merits order earlier entered.[15] Citgo continued to urge that opt-out provisions for class members in the various agreements also differed and necessarily impacted Citgo's rights to proceed or not to proceed with the settlement. Discussion also arose about Citgo's proposal to go forward independently with its purchase of the Oak Park Triangle properties, exactly as it had proposed under its settlement agreement. Several other defendants urged that they simply wanted to resolve and finalize their settlements.

On January 22, 1998, class counsel forwarded a letter to class members stating that Citgo

... has withdrawn their offer of settlement regarding this lawsuit, effectively removing themselves from the trial court's judicial supervision. Citgo has proposed to buy properties within the Oak Park Triangle at the price ordered by the trial court, and with the same conditions negotiated by our law firm.... In order to protect the interests of all the class members, we will be filing a motion today to decertify the class action that was originally certified ... in November of 1995. It is our belief that the original class certification no longer accurately reflects the current status of this litigation.

The motion was filed that same day, January 22, and urged that decertification would moot the pending interlocutory appeal, thereby removing any remaining obstacles to Citgo proceeding with its settlement agreement.[16] The trial court's order

---

15. While is it certainly true that the various defendants could agree to define settlement classes in whatever manner they chose, it is also true that if the various settlements are tied together with respect to distribution of funds, consistency would be required between those various settlements as to those definitions. The Citgo settlement was entered prior to the proposal for the new settlement classes, which are reflected in the later agreements.

16. Citgo filed an objection to dissolution in the trial court, urging that such action not be taken pending the appeal because it would deprive Citgo of its appellate remedies. Citgo

of January 27, 1998 stayed consideration of the motion to dissolve pending resolution of the pending appeal.

On January 23, 1998, the trial court issued an order (1) severing all claims against settling defendants other than Citgo, (2) conditionally certifying two of the proposed settlement classes for the Residential [17] and Commercial classes, (3) preliminarily approving the settlement agreements with the severed settling defendants as fair and reasonable, and (4) approving notice for the Commercial and Residential settlement classes.

Citgo forwarded a letter to all counsel on February 3, 1998, announcing it had undertaken an independent property purchase program in the Oak Park Triangle, following the guidelines set out by the trial court and the guardian ad litem.[18] Class counsel responded on February 12, 1998, stating it would not "stand between our Oak Park clients and a buy-out of their properties. Indeed Class Counsel are responsible for creating the buy-out in the first place.... However, we also represent non-Oak Park Class members who stand to lose ... as a result of Citgo's decision to breach its Settlement Agreement. This is to inform you and your client that we intend to hold you responsible for breach of the settlement agreement...." Appellees contend this buy-out, which then proceeded between April 1998 and March 1999, was the second instance of a breach of the settlement agreement by Citgo.

The supreme court dismissed the interlocutory appeal from the class certification order on July 14, 1998, finding that it did not have conflicts jurisdiction. On July 16, 1998, appellees withdrew their motion to decertify the class. Throughout the remainder of 1998 and 1999, appellees proceeded with discovery and other pre-trial matters, actively litigating the property devaluation claims against Citgo. The original class structure as defined in the class certification order of November 1995 remained in effect for Citgo, as a non-settling defendant, with respect to those class members who had not already resolved and released their claims against Citgo as a result of the Oak Park Triangle buy-out (which included some residents of the Hillcrest area as well).

The docket control order then in place identified May 1, 1999 as the deadline to amend pleadings, with a trial date of June 1, 1999. Trial was subsequently reset for January 24, 2000. Then, on January 12, 2000, appellees' counsel filed a notice of oral hearing on their motions and supplemental motions for preliminary approval of the settlement and approval of notice relating to the Citgo settlement agreement, filed in October 1997. That same date Citgo filed renewed and supplemental objections, urging that the settlement agreement had been abandoned or waived by the plaintiff class since then, it having taken numerous inconsistent actions. Citgo also urged the doctrine of quasi-estoppel prevented revival of the settlement agreement, as well as laches. Citgo further urged that appellees were requesting

---

also filed an emergency motion for temporary order of stay with the supreme court.

17. The Residential Class as approved by this January 1998 order, although differently defined from that set out in the earlier certification order of the court, encompasses essentially the same geographical properties, including the Oak Park Triangle. The Oak

Park Triangle is no longer defined as a separate class.

18. Citgo requested that it be notified immediately if any of the individuals identified as property owners were then represented by counsel and if any claims for attorneys' fees existed against any of the respective properties.

that the court approve a settlement to which Citgo never agreed. Citgo attached the affidavit of its in-house counsel, Miles Davidson, relating the sequence of events, the lack of opposition to and acquiescence with the Oak Park Triangle buy-out, the aggressive pursuit by appellees of their claims on the merits, including extensive and expensive discovery, their expressed determination to try the case against Citgo, as well as their expressed belief that the settlement agreement was no longer viable. Davidson also referenced a meeting in November 1998, at which appellees' counsel delivered a settlement demand for $14,000,000 to resolve the remaining claims. He stated there had never been any suggestion that the settlement agreement had any continuing effect in the intervening two years, that the trial setting in early summer of 1999 had passed without any reference to the supposed settlement, appellees had unequivocally abandoned the settlement agreement as void, and that active discovery had continued through December 1999. Davidson asserted that Citgo reasonably relied on those acts and statements to its detriment, proceeded with its buy-out of the Oak Park Triangle at the enhanced levels recommended by the guardian ad litem (ultimately costing in excess of $14.8 million, which was in excess of that provided for in the settlement agreement), and the additional expenditures on attorney fees and litigation expenses in excess of $500,000 in the intervening two years.

The trial court conducted a hearing on appellees' motions on January 14 and 25, 2000. The trial court noted that its letter of December 12, 1997, in which it ordered that a minimum of $50,000 was provided to each property owner in the Oak Park Triangle, was only directed to appellees' counsel and the guardian ad litem. The trial court's opinion was that

... this letter did not change the settlement agreement that was entered into by the parties, and it did not modify the money that Citgo was going to give to the Plaintiffs. The only thing that this letter was to do was to change the allocation or the distribution of the settlement proceeds, which had nothing to do with Citgo.... So although time has passed, it's still a viable settlement agreement in this Court's view.

The trial court then gave preliminary approval to the settlement agreement and severed Citgo out of the case. The trial court issued a formal order to that effect on January 25, 2000, reciting that the court found the settlement to be "sufficiently reasonable, adequate and fair to warrant giving notice to members of the Settlement Class...."

On March 29, 2000, appellees amended their petition to allege for the first time, as an alternative claim, that Citgo had breached the settlement agreement. Appellees urged, in addition to the other two alleged instances of breach, that Citgo had failed to fund the remaining balance of $5 million due under the settlement agreement within five days of its preliminary approval by the court.

The parties exchanged motions for summary judgment, which were each denied on April 25, 2001. Citgo filed a supplemental motion to decertify on July 6, 2001, urging that intervening events in the case and developments in case law, including *Southwestern Ref. Co., Inc. v. Bernal*, 22 S.W.3d 425, 435 (Tex.2000) (requiring a rigorous analysis to ensure predominance and superiority) precluded the matter from proceeding as a class action.

The parties tried the matter before the court in August 2001 on the breach of contract claim; an order finding breach issued October 17, 2001. The order recites, among other things, that (i) Citgo

entered into a valid and enforceable settlement which remained valid and enforceable at all times prior to Citgo's breach, (ii) Citgo waived any defense it may have had based on the lack of timely signatures of certain class representatives, (iii) the Plaintiff Class satisfied all of its obligations under the Settlement, · and all conditions precedent have been met or are excused, (iv) the Court never disapproved or modified Citgo's settlement but only made recommendations for a plan of distribution, (v) the Plaintiff Class did not waive its claims for breach, and (vi) did not make an election to abandon its claims for breach, and (vii) Citgo's other defenses and affir¬ mative defense were without merit.

The trial court held a separate hearing on attorneys' fees in February 2002, followed by another hearing in September 2002 (after providing notice to class members and an opportunity to be heard) to determine fairness of the settlement agreement. Final judgment, finding the settlement to be fair, adequate and reasonable, and· awarding damages in favor of appellees, issued April 4, 2003.

## Issues on Appeal

Citgo brings numerous issues on appeal, challenging not only the finding of breach but also asserting that the settlement agreement was rejected and/or modified by the court, and/or abandoned and/or waived by appellees prior to the issuance of the requisite court approval.[19] Citgo further urges that it was error to certify the matter as a class action, that common issues do not predominate, and that the trial court never conducted the requisite vigorous analysis. Citgo also challenges the award of attorneys' fees.[20]

---

**19.** Rule 42 requires that "the court must approve any settlement, dismissal, or compromise of the claims, issues, or defenses of a certified class." TEX.R. CIV. P. 42(e)(1)(A).

**20.** Citgo's issues on appeal are framed as · follows:

1. Following a bench trial, the trial court rendered judgment that CITGO breached a class action settlement agreement. It is black letter law that, absent a properly certifiable class action, class-wide settlements are neither valid nor enforceable. In light of the predominance, superiority, and typicality requirements of Rules 42(a). and (b)(4), as well as the "rigorous analysis" and "trial plan" requirements, did the trial court abuse its discretion in certifying the claims against CITGO as a 42(b)(4) class action? Following its original certification, did the trial court abuse its discretion in (1) maintaining the claims as a Rule 42(b)(4) class, instead of decertifying them; (2) approving a class action settlement agreement; and (3) rendering judgment against CITGO for breach of that agreement?

2. It is also the law that, to be valid and enforceable, settlement of a class action must first be approved by the trial court, and the court may only approve (or disapprove) the settlement actually presented by the parties—the court is powerless to approve a modified settlement to which one of the parties does not consent and impose the modified agreement upon the unwilling party. Did the trial court approve the settlement agreement that Plaintiffs and CITGO actually presented to the court, or was the "settlement" the court eventually approved a modified settlement to which CITGO never agreed?

3. Is the evidence legally and factually sufficient to support the following determinations of the trial court: (a) that CITGO entered into a settlement with the class which was valid and enforceable at all times prior to CITGO's alleged breach; (b) that CITGO breached the settlement agreement with the class; (c) that the class satisfied all of its obligations under the settlement and all conditions precedent were met or are excused; (d) that the class was damaged in the amount of $5 million by CITGO's alleged breach?

4. Does the evidence of Plaintiffs' intentional conduct inconsistent with claiming any rights under the settlement agreement conclusively prove that Plaintiffs waived and/or abandoned any rights or claim against CITGO under the settlement agreement?

Appellees counter that (1) class certification is a moot issue and not properly under review by this court, (2) the 1995 class certification was in any event the result of rigorous analysis by the trial court and satisfied the requisites of rule 42, (3) the trial court correctly found Citgo liable for breach, and (4) the trial court did not abuse its discretion in awarding attorneys' fees.

## The Settlement Agreement

 "The public policy of both our state and federal governments favors agreements to resolve legal disputes through such voluntary settlement procedures." *Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 267 (Tex.1992). The law favors settlement of disputes and the prevention of litigation, and therefore "compromise of doubtful and conflicting rights and claims is not only good and sufficient consideration to uphold an agreement, but it is highly favored in law." *McDonough v. First Nat'l Bank,* 34 Tex. 309, 320 (1871). "When parties agree to settle their differences, this is commonly understood as fully resolving those differences." *Gunn Infiniti v. O'Byrne,* 996 S.W.2d 854, 860 (Tex.1999) (citing *Herring v. Dunning,* 213 Ga.App. 695, 446 S.E.2d 199, 202 (1994); *Yancey v. Yancey,* 230 N.C. 719, 55 S.E.2d 468, 469 (1949) ("The word 'settle' means 'to place in a fixed or permanent condition; to determine.' And the word being used in connection with litigation must be understood as signifying that the

controversy had been adjusted and brought to an end.")).

In the circumstances of this case, any issue as to whether or not class certification was proper was necessarily resolved by compromise upon entry into a settlement agreement. However, where proper issues have been preserved and raised on appeal, we may not disregard the possibility that a party to such an agreement has abandoned or waived his rights thereunder, by inconsistent conduct or otherwise, effectively repudiating the agreement. Further, we may not fail to evaluate whether, in the instance of a class action, court approval was given to a still viable agreement as it was written, without modification (absent all parties' subsequent agreement), or to a different agreement.

 We determine that we must first evaluate whether the settlement agreement was viable at the time and in the same form as approved by the court, before we may determine whether it was breached. If the agreement was viable, the issue of class certification is moot and will not be addressed, and we will consider breach. If, however, the settlement agreement was not viable at the time of court approval, or was distinct from that ultimately approved by the court, then breach is no longer an issue, and we may consider whether the requisites of rule 42 were satisfied, such that class certification was proper.[21] *See* TEX.R.APP. P. 42.

5. Was the trial court's failure to find that Plaintiffs waived any rights or claim against CITGO under the settlement agreement against the great weight and preponderance of the evidence?

6. Is the evidence legally and factually sufficient to support the trial court's award of attorneys' fees to the class in connection with their breach of contract claim, and/or is the award excessive?

21. We reject appellees' contention that this court's prior review of the class certification issue absolutely precludes us from considering it further. The original class certification opinion, *Amerada Hess Corp. v. Garza,* 973 S.W.2d 667 (Tex.App.-Corpus Christi 1996, pet. dism'd w.o.j.) ("Garza I"), issued at an early point in the proceedings and considered only whether the trial court had appropriately assessed and had not abused its discretion in determining that, at that point in the litiga-

## A. Issues Relating to Viability of the Settlement Agreement

We first address (a) two subissues in Citgo's third issue (was the evidence legally and factually sufficient to support that (i) Citgo entered into a settlement with the class that was valid and enforceable at all times prior to Citgo's alleged breach, and (ii) the "Plaintiff Class satisfied all of its obligations under the Settlement and all conditions precedent have been met or are excused"), (b) Citgo's fourth issue (did appellees' intentional conduct inconsistent with claimed rights under the settlement agreement establish that appellees had waived and/or abandoned any rights or claim against Citgo under the settlement agreement), and (c) Citgo's fifth issue (was it against the great weight and preponderance of the evidence to fail to find that appellees waived any rights or claim against Citgo under the settlement agreement). We also address (a) the subissue in Citgo's first issue (whether the trial court abused its discretion in approving a class action settlement agreement), and (b) Citgo's second issue (whether the court approved the settlement agreement actually entered into between appellees and Citgo, or a "modified settlement to which Citgo" never agreed).

## B. Standard of Review

■ We note the underlying matter was tried to the court in a bench trial, with virtually all facts undisputed. The trial court's Order of October 17, 2001, included findings that, as a matter of law: (a) Citgo's settlement agreement remained valid and enforceable at all times prior to Citgo's breach; (b) the trial court "never disapproved or modified the settlement with the plaintiffs class but simply made recommendations ... for a plan of distribution of settlement proceeds from several settlements with multiple defendants, including Citgo;" (c) appellees did not waive their claims, and (d) appellees did not make any election to abandon their claims against Citgo.[22]

■ A trial court's conclusions of law are not binding on this Court, and we are free to make our own legal conclusions. *McAllen Police Officers Union v. Tamez*, 81 S.W.3d 401, 404–05 (Tex.App.-Corpus Christi 2002, pet. dism'd) (citing *Harlingen Irrigation Dist. Cameron County No. 1 v. Caprock Communications*, 49 S.W.3d 520, 530 (Tex.App.-Corpus Christi 2001, pet denied); *Muller v. Nelson Sherrod & Carter*, 563 S.W.2d 697, 701 (Tex.Civ.App.-Fort

---

tion, the requisites of rule 42 appeared to have been satisfied. In addition, the second interlocutory appeal dealing with the class certification issue, *Citgo Refining and Mktg., Inc. v. Garza*, 94 S.W.3d 322 (Tex.App.-Corpus Christi 2002, no pet.) ("Garza II"), directly addressed a jurisdictional question (whether an order of notice to the class constituted a fundamental alteration in the nature of the class). While observations of the court may well be applicable and appropriate to consider, none of these cases, in our view, constitute law of the case or preclude us from considering certification issues, should that be appropriate based upon other findings. Further, we agree that the requirements of *Southwestern Refining Co. v. Bernal*, 22 S.W.3d 425 (Tex.2000) are appropriately applied to determine whether class certification

is proper. *See State Farm Mut. Auto Ins. Co. v. Lopez*, 156 S.W.3d 550, 555–56 (Tex.2004) (holding that analysis required in *Bernal* is properly applied even where certification order issued prior to *Bernal* ).

22. We agree that approval of a settlement in a class action, including the determination of whether it is fair and equitable, is left to the sound discretion of the trial court, and is not to be disturbed absent an abuse of discretion. *Gen. Motors Corp. v. Bloyed*, 916 S.W.2d 949, 955 (Tex.1996). However, before determining whether a settlement is fair and equitable, it is necessary to determine whether the proposed settlement still survives as a viable agreement.

Worth 1978, no writ)). "Conclusions of law are reviewed de novo as a question of law and will be upheld if the judgment can be sustained on any legal theory supported by the evidence." *Tamez*, 81 S.W.3d at 404–05; *Harlingen Irrigation Dist.*, 49 S.W.3d at 520 (citing *Circle C Child Dev. Ctr., Inc. v. Travis Cent. Appraisal Dist.*, 981 S.W.2d 483, 485 (Tex.App.-Austin 1998, no pet.)). A trial court's conclusions of law may not be reviewed for factual sufficiency, *Tamez*, 81 S.W.3d at 404, and may be reversed only if they are erroneous as a matter of law. *Id.* (citing *Stable Energy, L.P. v. Newberry*, 999 S.W.2d 538, 547 (Tex.App.-Austin 1999, pet. denied); *Hofland v. Fireman's Fund Ins. Co.*, 907 S.W.2d 597, 599 (Tex.App.-Corpus Christi 1995, no writ)). Incorrect conclusions of law do not require reversal, provided that the controlling findings of fact support a correct legal theory. *Tamez*, 81 S.W.3d at 405; *Stable Energy*, 999 S.W.2d at 547.

## C. Viability of the Agreement— Analysis

■ In form, the agreement approved by the trial court in January 2000 is the same agreement entered into by Citgo in September 1997 and first tendered for approval in October 1997. Citgo contends, however, that changes in the posture of the case in the intervening years necessarily impacted the rights and provisions under Citgo's settlement. Citgo urges that the original class structure as set out in the November 1995 certification order, and upon which its settlement was crafted, was abandoned and no longer viable. Citgo

further urges that members of the Oak Park Triangle class, as well as some other members of the North Class in the Hillcrest area, had sold their properties to Citgo and independently settled and executed releases in favor of Citgo. Yet, they remain within the defined settlement classes as the agreement was approved.

The facts are unequivocal in establishing that the settlement with Citgo was executed in September 1997,[23] it was tendered to the trial court for approval in October 1997, that approval was not forthcoming, a guardian ad litem was appointed to review fairness of the settlement, that the ad litem found problems with the settlement and, in light of comments from the court, worked to craft a network of settlements that would provide a higher recovery to members of the Oak Park Triangle. In the meantime, the parties attempted to renegotiate certain terms to meet concerns of the trial court. Those modifications were then tendered to the trial court, and they were also rejected as inadequate. The fact that the trial court later took the position that its actions did not "change the settlement agreement" and "did not modify the money that Citgo was going to give to the Plaintiffs" does not alter the fact that the trial court never gave approval to the settlement agreement prior to January 25, 2000. The court, in its order, asserts that it only intended to "change the allocation or the distribution of the settlement proceeds, which had nothing to do with Citgo." However, it nevertheless did impact Citgo[24] in that, at the least,

---

**23.** We note that all of the class representatives never executed the settlement agreement, but no issue as to this has been raised in this appeal, and appellees contend that any such issue was, in any event, waived.

**24.** We also note the effects of trying to craft inter-related settlement agreements in a "global settlement," where Citgo's settlement

was drafted as a stand-alone agreement, necessarily did impact Citgo's rights under the settlement. We agree that the proposals would have altered Citgo's ability to independently determine whether to proceed despite excessive opt-outs, and they would have inextricably intertwined not only Citgo with other

preliminary approval of the Citgo settlement was delayed for more than two years. The real problem and complication is that until January 2000, the trial court never treated the Citgo settlement agreement as a stand-alone agreement independent of other settlements. Rule 42 of the Texas Rules of Civil Procedure mandates that the trial court "must approve any settlement, dismissal, or compromise of the claims, issues, or defenses of a certified class." TEX.R. CIV. P. 42(e)(1)(A). The court must approve the agreement as it is tendered. The court may issue such approval only after a hearing and upon finding that the settlement, dismissal, or compromise is fair, reasonable, and adequate. TEX.R. CIV. P. 42(e)(1)(C). Until such mandatory approval is given, a class action may not be dismissed or compromised, and any such settlement agreement therefore remains contingent upon that approval. *See* TEX.R. CIV. P. 42.

In the interim time period, significant events altered the landscape. Citgo subsequently completed the buy-out of properties in the Oak Park Triangle to which appellees acquiesced. In so doing, Citgo paid values exceeding those set out in the settlement agreement, in order to address concerns raised by both the trial court and the guardian ad litem. At the time of approval of the agreement, therefore, the Oak Park Triangle class had already, in majority, released its claims against Citgo.

Citgo urges that during this interim period appellees, by their conduct, either abandoned or waived, or were estopped to pursue any rights or claims under the settlement agreement.

 Waiver has been defined as "intentional conduct inconsistent with the assertion of a known right." *Bocanegra v. Aetna Life Ins. Co.*, 605 S.W.2d 848, 851 (Tex.

1980); *CKB & Assoc., Inc. v. Moore McCormack Petroleum Inc.*, 734 S.W.2d 653, 656 (Tex.1987). Waiver may be the result of intentional conduct inconsistent with claiming that right, and may be inferred from a person's conduct. *Sun Exploration and Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex.1987); *First Interstate Bank, N.A. v. S.B.F.I., Inc.*, 830 S.W.2d 239, 248 (Tex.App.-Dallas 1992, no writ).

 The doctrine of quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by him. *Stable Energy, L.P. v. Newberry*, 999 S.W.2d 538, 548 (Tex.App.-Austin 1999, pet. denied); *Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236, 240 (Tex.App.-Corpus Christi 1994, writ denied). The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one in which he previously acquiesced, or from which he accepted a benefit. *Newberry*, 999 S.W.2d at 548; *Albrecht*, 878 S.W.2d at 242–43.

Citgo also contends that appellees, by their intentional conduct inconsistent with pursuit of the settlement agreement, effected such a delay as to justify Citgo in believing the agreement had been abandoned, and that, indeed, Citgo relied upon that conduct and other related communications to its detriment.

Specifically, following the court's failure to approve the settlement agreement, appellees aggressively pursued their claims on the merits, including extensive and expensive discovery through December 1999. They clearly expressed their intent to try the case against Citgo on the merits. In November 1998, appellees delivered a settlement demand for $14,000,000 to resolve the remaining claims; not only did this demand exceed that provided for in the

defendants, but also the various classes with each other.

Citgo agreement, but it also reflects a position and, under reasonable interpretation, a reasonable belief that the earlier agreement had been abandoned. Appellees also filed a motion to decertify the class. They tendered and secured certification of classes differently defined from those in the Citgo agreement to accomplish settlements with other defendants. Beyond the one letter sent February 3, 1998, to which there was no follow-up, appellees made no overt expression in the intervening time—in excess of two years—that they intended to pursue the settlement, and all activity in the case reflected that it had been abandoned. Evidence was tendered that Citgo reasonably relied on appellees' acts and statements to its detriment, including by proceeding with its buy-out of the Oak Park Triangle at the enhanced levels recommended by the guardian ad litem (ultimately costing in excess of $14.8 million) (an amount in excess of that provided for in the settlement agreement), and that Citgo sustained extensive additional expenses and attorneys' fees in the intervening time.

Appellees contend that they were entitled to pursue alternative claims right up until trial, including either claims on the merits, or claims for breach of the settlement agreement (which would dispose of claims on the merits). We disagree. It is certainly true that a claimant may simultaneously pursue alternative remedies, based upon the same or similar causes of action, and a claimant may even pursue inconsistent theories of recovery or causes of action. However, the thrust of a claimant's efforts in such circumstances are to seek redress for a wrong. Upon a perceived breach, as appellees contended in February 1998, appellees had the option to pursue either a breach of contract claim on the settlement agreement or to reassert their original claims on the underlying merits. *Murray v. Crest Constr.*, 900

S.W.2d 342, 344 (Tex.1995) (citing 12 JAEGAR, WILLISTON ON CONTRACTS § 1457, at 49 (3d ed.1970) (when a claim is released for a promised consideration that is not given, the claimant may either pursue rights under the release, or treat the release as rescinded and recover on the claim)). Appellees could not do both.

## Conclusion

We conclude that appellees engaged in intentional and, indeed, aggressive conduct inherently inconsistent with the pursuit of rights under a settlement agreement that was not approved by the trial court, that Citgo relied upon that conduct and engaged in alternative acts (including the Oak Park buy-out), with acquiescence from appellees, that were inherently inconsistent with the provision of relief exclusively under the settlement agreement, and that Citgo's conduct was reasonable in the circumstances. We conclude that appellees are estopped from asserting, to Citgo's disadvantage, rights inconsistent with positions previously taken by appellees. We therefore conclude that the settlement agreement was not viable in January 2000, and could not then have been approved by the trial court. Because we reach this conclusion, we need not reach the remaining issues on appeal. *See* TEX.R.APP. P. 47.1. We reverse and remand.

## OPINION ON REHEARING

We reaffirm our opinion which issued September 30, 2005, except to the extent it concluded that we did not need to reach the issue of whether or not class certification was appropriate. We here address Citgo's contention on appeal that the trial court abused its discretion in (1) initially certifying the matter as a class action (urging that common issues do not predominate and the requisite vigorous analysis was never performed), and (2) failing to

recognize later changed circumstances and decertify the class. In our previous opinion, we reversed and remanded for further proceedings. We grant Citgo's motion for hearing, expanding the issues to be considered upon remand, and direct the trial court to conduct the requisite rigorous analysis with respect to the motions to decertify, based on the changed circumstances of the case.

## I. Background

The history of this litigation has been extensively set forth in our opinion of September 30, 2005. With respect to certification, the record reflects that the trial court held a hearing on those issues beginning on October 19, 1995. Plaintiff class claims centered on permanent damage to real property and diminution in value, based on negligence, trespass, and nuisance. The class was originally certified in November 1995.[1]

Two interlocutory appeals addressed the certification question, the first challenging the original 1995 certification order. This Court's opinion in *Amerada Hess Corp. v. Garza,* 973 S.W.2d 667 (Tex.App.-Corpus Christi 1996), *pet. dism'd w.o.j., Coastal Corp. v. Garza,* 979 S.W.2d 318 (Tex.1998), considered only whether the trial court had appropriately addressed and had not abused its discretion in determining that, at that point in the litigation, the requisites of rule 42 appeared to have been satisfied. A second interlocutory appeal was later brought to determine whether an order of notice to the class constituted a fundamental alteration in the nature of the class. *See Citgo Refining and Mktg., Inc. v. Garza,* 94 S.W.3d 322 (Tex.App.-Corpus Christi 2002, no pet.).

In our opinion of September 30, 2005, we rejected appellees' contention that these earlier reviews of the class certification issue preclude us from considering it further. None of those appeals, in our view, constitute law of the case or preclude us from considering certification issues.

While the second interlocutory appeal remained pending, many defendants settled with the plaintiff class, and on January 23, 1998, the trial court issued an order severing all claims against those settling defendants. In February 1998, because the trial court had not yet approved the proposed settlement between Citgo and the class, Citgo initiated an independent buy-out of the properties located in the Oak Park Triangle.[2] The remaining defendants, other than Citgo, were severed out of the case in January 2000. Although differently-defined classes were crafted for many of the settling defendants, the original class structure, as set out in the certification order of November 1995, remains in effect for Citgo and all class members.

## II. Rule 42 and Class Certification

### A. Standard of Review

Although we discuss the propriety of the class certification in light of the claims asserted by the named plaintiffs, we in no way evaluate the merits of these claims. *See Intratex Gas Co. v. Beeson,* 22 S.W.3d 398, 404 (Tex.2000) ("Deciding the merits of the suit in order to determine ... its maintainability as a class action is not appropriate."). No automatic right exists to maintain a lawsuit as a class action. *Southwestern Ref. Co. v. Bernal,* 22 S.W.3d 425, 439 (Tex.2000) (quoting *Sun Coast Res., Inc. v. Cooper,* 967 S.W.2d 525,

---

**1.** The plaintiff class also originally brought claims for medical monitoring and personal injury, but these were not included in the certification order.

**2.** See detailed discussion in Part IV below.

529 (Tex.App.-Houston [1st Dist.] 1998, pet. dism'd w.o.j.)).

 Our review of a decision on a class certification order is limited to determining whether the trial court's order constituted an abuse of discretion. *Ford Motor Co. v. Ocanas,* 138 S.W.3d 447, 451 (Tex. App.-Corpus Christi 2004, no pet.); *see also Henry Schein, Inc. v. Stromboe,* 102 S.W.3d 675, 691 (Tex.2002). In reviewing a trial court's decision under an abuse of discretion standard, we must determine whether the trial court acted without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). The exercise of discretion is within the sole province of the trial court, and an appellate court may not substitute its discretion for that of the trial judge. *Johnson v. Fourth Ct.App.,* 700 S.W.2d 916, 918 (Tex. 1985). Rather, an abuse of discretion occurs only when the trial court reaches a decision that is "so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Id.* at 917.

 Typically, under this standard of review, the appellate court must indulge every presumption favorable to the trial court's ruling. *Fid. and Guar. Life Ins. Co. v. Pina,* 165 S.W.3d 416, 422 (Tex.App.-Corpus Christi 2005, no pet.) (citing *Graebel/Houston Movers, Inc. v. Chastain,* 26 S.W.3d 24, 29 (Tex.App.-Houston [1st Dist.] 2000, pet dism'd w.o.j.)). On certification issues, however, the appellate court is not bound by this presumption and must independently determine whether the requirements of rule 42 have been fully satisfied. *Pina,* 165 S.W.3d at 422; *Ocanas,* 138 S.W.3d at 451; *see also Schein,* 102 S.W.3d at 691 ("Compliance with Rule 42 must be demonstrated; it cannot be presumed."); *Bernal,* 22 S.W.3d at 435. The supreme court has expressly rejected the approach of "certify now and worry later."

*Schein,* 102 S.W.3d at 690; *Bernal,* 22 S.W.3d at 435. The plaintiffs bear the burden of showing their entitlement to certification. *See Sun Coast Res.,* 967 S.W.2d at 529; *Glassell v. Ellis,* 956 S.W.2d 676, 682 (Tex.App.-Texarkana 1997, pet. dism'd w.o.j.).

 The trial court must conduct a "rigorous analysis" to determine whether certification requirements have been met. *Bernal,* 22 S.W.3d at 435; *accord, Schein,* 102 S.W.3d at 688. This rigorous analysis must include indicating how the claims will likely be tried so that conformity with rule 42 can be meaningfully evaluated. *Schein,* 102 S.W.3d at 688. Courts are to "go beyond the pleadings" and understand the "claims, defenses, relevant facts, and applicable substantive law" in order to make a meaningful determination that the requirements of certification have been met. *Bernal,* 22 S.W.3d at 435.

Further, we agree that the requirements of *Bernal* are appropriately applied to determine whether class certification is proper. *See State Farm Mut. Auto. Ins. Co. v. Lopez,* 156 S.W.3d 550, 556 (Tex.2004) (holding that the analysis required by *Bernal* is properly applied even where a certification order issued prior to *Bernal*). Accordingly, we perform that analysis here.

## B. The Nature of Class Actions

The class action serves as a mechanism to eliminate or reduce the threat of repetitive litigation, prevent inconsistent resolution of similar cases, and provide a means of redress for individual claims that are too small to make independent actions economically viable. *Ford Motor Co. v. Sheldon,* 22 S.W.3d 444, 452 (Tex.2000). A principal purpose of the class action device is efficiency and economy of litigation. *See id.* (discussing the origins and general design of the class action device). When

properly used, a class action saves the court's and the parties' resources by allowing class-wide issues to be tried in an economical fashion. *See id.* (citing *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 155, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)).

Thus, class actions furnish an efficient means for numerous claimants with a common complaint to obtain a remedy "where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages." *Gen. Motors Corp. v. Bloyed,* 916 S.W.2d 949, 952 (Tex.1996) (citing *Deposit Guar. Nat'l Bank v. Roper,* 445 U.S. 326, 339, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980)). Class actions also facilitate the spreading of litigation costs among numerous litigants with similar claims. *Bloyed,* 916 S.W.2d at 953 (citing *U.S. Parole Comm'n v. Geraghty,* 445 U.S. 388, 403, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980)).

■ However, the class-action format "must not unduly restrict a party from presenting viable claims or defenses without that party's consent." *Bernal,* 22 S.W.3d at 435–36 (citing Tex.R. Civ. P. 815; Tex. Gov't Code Ann. § 22.004(a)[3] (providing that state procedural "rules may not abridge, enlarge, or modify the substantive rights of a litigant.")). Accordingly, the class-action device may not alter the parties' burden of proof, right to a jury trial, or substantive prerequisites to recovery. *Bernal,* 22 S.W.3d at 437.

■ A trial court's decision to certify a class can have "staggering economic consequences." *Schein,* 102 S.W.3d at 701 (O'Neill, J., dissenting). Thus, even though it is an efficient device, the right to litigate a claim as a class action is not unfettered; a trial court may certify a class action only if the plaintiff satisfies the requirements of the rule. Tex.R. Civ. P.

42; *Sheldon,* 22 S.W.3d at 452–53 (citing *Weatherly v. Deloitte & Touche,* 905 S.W.2d 642, 647 (Tex.App.-Houston [14th Dist.] 1995, writ dism'd w.o.j.), *mandamus denied,* 951 S.W.2d 394 (Tex.1997)).

## C. The Statutory Requirements for Certification

A member of a class may sue or be sued as a representative party of the class only if all of the following requirements of Texas Rule of Civil Procedure 42(a) are satisfied: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Tex.R. Civ. P. 42(a). Additionally, at least one of the enumerated requirements set forth in rule 42(b) must be met: (1) adjudication of separate actions would create a risk of inconsistent results or impairment of the interests of other members not parties to the adjudication; (2) the defendant has acted or refused to act on grounds applicable to the entire class; (3) the object of the action is the adjudication of claims affecting specific property involved in the action; or (4) common questions of law or fact predominate over any questions affecting only individual members, and a class action is the superior method of fairly and efficiently adjudicating the controversy. Tex.R. Civ. P. 42(b).

■ When reviewing the merits of the court's decision, we are limited to considering the material that was before the court at the time that it ruled. *Lebron v. Citicorp Vendor Fin.,* 99 S.W.3d 676, 679 (Tex. App.-Eastland 2003, no pet.); *Monsanto*

---

**3.** Tex. Gov't Code Ann. § 22.004(a) (Vernon 2004).

*Co. v. Davis,* 25 S.W.3d 773, 781 (Tex.App.-Waco 2000, pet. denied).

■ Rule 42 is patterned after its federal counterpart. *Bernal,* 22 S.W.3d at 433; *compare* Fed.R.Civ.P. 23 *with* Tex.R. Civ. P. 42. Consequently, federal decisions and authorities interpreting current federal class-action requirements are persuasive authority in applying rule 42. *Bernal,* 22 S.W.3d at 433.

### 1. Numerosity

■ A putative class, to satisfy the numerosity requirement, must show that "the class is so numerous that joinder of all members is impracticable." *Bernal,* 22 S.W.3d at 433. The determination of the numerosity issue is not based on numbers alone. In *Chastain,* the court stated:

> The test is whether joinder of all members is practicable in view of the size of the class and such factors as judicial economy, the nature of the action, geographical location of class members, and the likelihood that class members would be unable to prosecute individual lawsuits.

*Chastain,* 26 S.W.3d at 29, 32 (citing *Weatherly v. Deloitte & Touche,* 905 S.W.2d 642, 653 (Tex.App.-Houston [14th Dist.] 1995, writ dism'd w.o.j.)).

### 2. Typicality

■ Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." *Bernal,* 22 S.W.3d at 433. A class representative must possess the same interests and suffer the same injury as unnamed or absent class members. *Falcon,* 457 U.S. at 156; *State Farm Mut. Auto. Ins. Co. v. Lopez,* 45 S.W.3d 182, 191 (Tex.App.-Corpus Christi 2001), *rev'd on other grounds,* 156 S.W.3d 550 (Tex.2004). To be typical, class representatives' claims need not be identical, but must arise from

the same event or course of conduct giving rise to the claims of other class members and must also be based on the same legal theories. *Weatherly,* 905 S.W.2d at 653. Other courts have described this as a requisite "nexus between the injury suffered by the representative and the injuries suffered by other members of the class." *Dresser Indus., Inc. v. Snell,* 847 S.W.2d 367, 372 (Tex.App.-El Paso 1993, no writ).

### 3. Adequacy

■ The adequacy of representation requirement consists of two elements: (1) it must appear that the representatives, through their attorneys, will vigorously prosecute the class claims; and (2) there must be an absence of antagonism or conflict between the representatives' interests and those of the class members. *Chastain,* 26 S.W.3d at 32 (citing *Sun Coast Res.,* 967 S.W.2d at 538). Determining adequacy of representation includes a consideration of the following factors: (1) counsel's adequacy, (2) potential conflicts of interest, (3) the plaintiff's personal integrity, (4) the representatives' interests and those of the class members, (5) whether the class is unmanageable, and (6) whether the plaintiff can afford to finance the class action. *Chastain,* 26 S.W.3d at 32; *Forsyth v. Lake LBJ Investment Corp.,* 903 S.W.2d 146, 151 (Tex.App.-Austin 1995, writ dism'd w.o.j.).

### 4. Commonality

■ The proponent of class certification must establish that there are questions of law or fact common to the class. Tex.R. Civ. P. 42(a); *Bernal,* 22 S.W.3d at 433. "Questions common to the class" are questions that, when answered as to one class member, are answered as to all class members. *Rio Grande Valley Gas Co. v. City of Pharr,* 962 S.W.2d 631, 641 (Tex. App.-Corpus Christi 1997, pet. dism'd

w.o.j.). This requirement does not mean that all or even a substantial portion of the legal and factual questions must be common to the class. A single common question may provide adequate grounds for a class action under appropriate circumstances. *Id.; see Sun Coast Res.,* 967 S.W.2d at 532 ("The threshold of 'commonality' is not high.") (quoting *Jenkins v. Raymark Indus., Inc.,* 782 F.2d 468, 472 (5th Cir.1986)). In most cases in which appellate courts have found an absence of commonality, the opinions have emphasized the great factual diversity of the individual claims and the ultimate dependence of any common legal questions on the facts of each individual claim. *See, e.g., Bernal,* 22 S.W.3d at 436.

### 5. Rule 42(b)-Predominance and Superiority

In addition to satisfying the requisites of rule 42(a), the class representative is required to demonstrate that a class action is maintainable because it satisfies one of the requisites of rule 42(b). *See* Tex.R. Civ. P. 42(a); 42(b). Here, although there is no specific finding, argument centered on and the record reflects that certification was based upon satisfaction of the present rule 42(b)(3), that common questions of law or fact predominated over individual issues.[4]

The commonality requirement under rule 42(a) is distinguished from the more stringent provision of rule 42(b)(3) that common questions of law or fact must predominate over questions involving individual members. Tex.R. Civ. P. 42(a); Tex.R. Civ. P. 42(b)(3); *Bernal,* 22 S.W.3d at 433. Predominance is "one of the most stringent prerequisites to class certification;" its exacting standards act "as a check on the flexible commonality test un-

der Rule 42(a)(2)." *Bernal,* 22 S.W.3d at 435.

A non-exhaustive list of factors relevant to the predominance inquiry includes (1) the interest of members of the class in individually controlling the prosecution or defense of their particular actions, (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class, (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum, and (4) the difficulties likely to be encountered in the management of a class action. Tex.R. Civ. P. 42(b)(4); *Bernal,* 22 S.W.3d at 433–34. The test for establishing predominance of common issues is whether those issues will be the object of most of the efforts of the parties and the court, not whether common issues outnumber individual issues. *Id.* at 434.

A trial court ruling on commonality and predominance must first identify the substantive issues controlling the litigation's outcome. *Chastain,* 26 S.W.3d at 33. The purpose of this requirement is to determine whether the character and nature of the case satisfy the requirements of the class-action procedural rule, not to weigh the substantive merits of each class member's claim. *Id.*

Next, the trial court must correctly identify the elements of the named plaintiffs' causes of action. Then,

> The question the court must decide before certifying a class, after rigorous analysis and not merely a lick and a prayer, is whether the plaintiffs have demonstrated that they can meet their burden of proof in such a way that com-

---

4. At the time this plaintiff class was certified, rule 42 contained four subdivisions; rule 42(b)(4) included the language currently found in rule 42(b)(3). *See* Tex.R. Civ. P. 42(b)(4) (1977, amended 2004).

mon issues predominate over individual ones.

*Schein,* 102 S.W.3d at 694.

■ As to the effect of damages calculations on commonality and predominance, the fact that damages must be computed separately for each class member does not necessarily mean in itself that individual issues predominate over common issues of law and fact. *Sun Coast Res.,* 967 S.W.2d at 534. Nor will the existence of affirmative defenses prevent class certification. *Chastain,* 26 S.W.3d at 30; *see, e.g., Manning,* 914 S.W.2d at 613–14 (including affirmative defenses of contributory negligence, superseding cause, and failure to comply with warranty); *Dresser Indus.,* 847 S.W.2d at 373 (including affirmative defenses of limitations, lack of misrepresentation, and ratification). Finally, a class action must be the superior means by which to address the claims. Superiority exists when "the benefits of class-wide resolution of common issues outweigh any difficulties that may arise in the management of the class." *Union Pac. Res. Group, Inc. v. Hankins,* 51 S.W.3d 741, 754 (Tex.App.-El Paso 2001), *rev'd on other grounds,* 111 S.W.3d 69 (Tex.2003); *Chastain,* 26 S.W.3d at 34. In determining whether a class action is superior, factors the trial court may consider include (1) class members will benefit from the discovery that has already been completed, thereby eliminating duplication of effort, (2) the trial court has already spent substantial time and effort becoming familiar with the issues of the case, which weighs favorably for a fair and expeditious result, and (3) class members have an interest in resolving common issues by class action. *Hankins,* 51 S.W.3d at 754–55; *Chastain,* 26 S.W.3d at 35.

## III. The Original Class Certification in 1995

### A. The Proceedings

The initial certification hearing took place over two lengthy days in October 1995. Extensive briefing and evidence were submitted by all parties. Counsel for the plaintiff class urged that numerosity was satisfied, inasmuch as more than thirteen thousand people, with approximately four thousand separate family units or pieces of property, were within the requested geographic boundaries and definition of the plaintiff class. Claims (including diminished property values) were alleged to arise out of the same practice or course of conduct on the part of the defendants and to be common to all. It was urged that the key issue that would predominate and encompass the bulk of the litigants' efforts was to "what extent and in what amounts defendants negligently and intentionally discharged toxic chemicals into the plaintiff class's environment." The plaintiff class urged that issues of the existence and extent of any discharges, as well as impact on real estate values (which could be crafted over the plaintiff class by a mathematical model), would be common to the plaintiff class and predominate.[5]

Class representatives, as owners of property within the proposed plaintiff class boundaries exposed to the defendants' alleged negligent and nuisance activities with the resultant air and groundwater

---

5. Evidence tendered for purposes of class certification suggested that all properties in the affected area had sustained diminution in market values that far exceeded what would normally be expected for properties near an encroaching industrial area. The putative class urged that the adverse impact on property values was significant and could be measured on a class-wide basis, while conceding that some individualized damage calculations would be required, depending upon a property's proximity to the facilities.

pollution, were presented as having claims typical of the plaintiff class.[6] Representatives and counsel were also presented as being adequate to ensure vigorous prosecution of the suit, with no internal conflicts within the plaintiff class. Class representatives were located throughout the area. Class certification was urged as appropriate and superior, and as the only means by which many of these lower-income people could bring forward a suit.

The plaintiff class presented extensive evidence in support of its motion for certification, including (1) evidence that spills at various facilities did occur, (2) numerous affidavits and reports of experts relating to air particulate and groundwater emissions, pollution, contamination, and dispersion modeling,[7] and (3) communications from the Nueces County Appraisal District reflecting reduced property values in the Oak Park Triangle area directly attributable to the presence of pipelines, and pollution or contamination.

Testimony at the hearing included that of some proposed class representatives. Ms. Simms expressed familiarity with the issues involved, a history of trying to rectify the problem short of litigation, familiarity with the claims of her neighbors, and a zeal to maintain that involvement in the capacity of class representative. She also testified that neither she nor her neighbors could afford to independently pursue litigation against the defendants. Reverend Verlon Friar, another long-time resident who was well-known in his neighborhood, also displayed familiarity with and knowledge of the basic tenets and status of the suit.

The defendants, including Citgo, urged that they were not a unified block, inasmuch as the facilities in issue had been constructed or purchased at different times and served different functions; the various alleged contaminants could not have originated uniformly with all of the defendants, and instead issued from different sources at different times. Defendants urged that resultant problems with assessing comparative responsibility strongly undermined common issues and any usefulness that certification might otherwise serve. Defendants also tendered argument and expert testimony challenging the proposed medical monitoring class. They expressed concerns with how the case could be tried and stressed the difficulties in determining property values on a class-wide basis, suggesting that the court proceed instead with bellweather trials. Evidence submitted to counter arguments of the proposed plaintiff class included EPA documents, deposition testimony, affidavits and reports of various experts challenging the plaintiffs' emissions analysis and air dispersion modeling (both in theory and application),[8] and therefore the proposed plaintiff class boundaries. Defendants tendered expert testimony of a real estate appraiser who contended that properties he examined as a sample were neither common nor typical of all those proposed to be included in the plaintiff class, that not all properties had

---

6. At the time of this hearing, plaintiffs sought certification of a property damage class (with a subclass for those exposed to groundwater contamination) and a medical monitoring class. Only the property damage classes were certified and are in issue.

7. Also included were expert affidavits and reports relating to health issues and the claims for medical monitoring. Objections to the evidence were overruled; all evidence was admitted for the single purpose of determining the appropriateness of class certification.

8. Defendants contended that plaintiff experts had made incorrect assumptions with respect to amounts of releases and drift characteristics that were fatal to the models relied upon to establish class-wide characteristics.

sustained groundwater contamination,[9] and not all diminution in value could be attributed to location. Defendants contended that the location of properties, their varying neighborhoods, the distinction between residential or commercial uses, and the individual perceptions of the various owners created problems that could not adequately be addressed by crafting subclasses and militated against any class certification. Defendants also urged that the existence of nuisance claims, with the potential defense of the statute of limitations, meant that individual issues would predominate.

A rebuttal witness for the plaintiff class, Dr. Smith, testified as to economics and cost-benefit analysis with respect to property valuations. His model, based on market analyses and appraisal values,[10] took into consideration that all properties in the proposed plaintiff class were not affected in an equal manner. He was able to craft his model estimating percentage impact on or loss to valuation from pollution based on a property's distance from the facilities in issue. He spoke of general diminution in value as a whole of approximately 23% over the proposed plaintiff class area, with a very sharp increase in diminution of value of up to 60% as one approached the

facilities. Demarcation lines corresponded to some of the city streets and highways. He specifically noted differences near boundaries such as I–37, Agnes, Port, and Leopard streets. He testified that percentage injury would be nearly the same to properties in proximal distance from the facilities, regardless of the use or any special attributes of the property.[11]

The trial court issued an order certifying the plaintiff class on November 14, 1995, composed of three classes and various subclasses:

(1) All persons who, as of June 1, 1991, were vested with fee title to real property zoned for single family residential use within the following geographical area bounded by Interstate Highway 37 on the South; Navigation Boulevard on the West; the Defendants' Properties on the North and North Port on the East [the "I–37 North Class"]. Each class member shall, with respect to each separate residential property owned by such class member also be a member of an I37 North Class Acquisition Date Subclass. A class member may also be a member of the I37 North Free Phase Hydrocarbon Property Damage subclass [the "Oak Park Triangle Class"]; and [12]

9. Defendants at the hearing conceded that hydrocarbon contaminants were located in the ground and groundwater beneath a bulk of the properties in the Oak Park Triangle.

10. Data was based upon 1994 tax appraisal values, but Dr. Smith testified that diminution was a continuous process over years. He agreed that persons who lived further away or who had only recently purchased property would have sustained less negative impact.

11. At the conclusion of testimony, counsel for the putative class clarified that some class representatives indeed owned commercial properties within the proposed plaintiff class area, and additional business owners were ready to serve in the capacity of representatives, but were also satisfied with those

already proposed as representatives. Additional affidavits from both residential and business owners were tendered as evidence to counter defense arguments that most persons in the affected area were unconcerned about the issue. Objections to the affidavits were overruled. Counsel also addressed the superiority of a class action over the bellweather trials alternative, including the economic savings that could be realized if certification did occur.

12. Subclasses were defined based upon date of acquisition of property, whether (1) before June 1, 1971, (2) after June 1, 1971 but before June 1, 1976, (3) after June 1, 1976 but before June 1, 1981, (4) after June 1, 1981 but before June 1, 1986, and (5) after June 1, 1986 but before June 1, 1991.

(2) All persons who, as of June 1, 1991, [are] members of the I37 North Residential Property Damage Class and whose real property within that class overlies and/or has been contaminated by the subsurface plume of toxic contaminates which geographical area is not greater than the area of the striped triangle on the Property Damage Class Map in Plaintiff's Exhibit 31 [the "Oak Park Triangle Class"];[13]

(3) All persons who, as of June 1, 1991, owned real property zoned for single family residential use within the following geographical area bounded by the Agnes Street on the South, Baldwin Boulevard/ Navigation Boulevard on the West, Interstate Highway 37 on the North and Port Street on the East [the "I-37 South Class"]. Each class member shall be, with respect to each separate residential property owned by each such class member, a member of a Location Subclass. Each Location Subclass Member shall also be a member of an I37 south Class Acquisition Date Subclass.[14]

The order certifying the plaintiff class, in addition to identifying the various classes and subclasses, states "The Court finds the Plaintiffs have satisfied their burden of presenting some evidence that reasonable class definitions and other conditions of Rule 42 are satisfied with respect to the Plaintiffs' proposed property damage classes."[15]

### B. Analysis

The original appeal to this Court from the certification order (1) challenged appellees' standing to sue, (2) charged certification violated the parties' right to a jury trial, and (3) claimed certification was precluded by comparative responsibility statutes. This Court reviewed all requisite prongs under rule 42, and found no abuse of discretion. *See Amerada Hess Corp. v. Garza*, 973 S.W.2d at 680. In this appeal, Citgo urges that no rigorous analysis was performed, the trial court did not indicate how claims would be tried, claims of the class representatives were not typical, common issues did not predominate, and certification was not the superior method by which to address these issues.

We note the extensive discussion of numerosity, commonality, and typicality presented in our earlier opinion, *Amerada Hess v. Garza*, 973 S.W.2d at 674–77. We agree with our analysis of those prongs. The principal changes in class certification analysis since that 1996 opinion have occurred in connection with the demand for rigorous analysis and satisfaction of the predominance requirement. *See Bernal*, 22 S.W.3d at 435. Therefore, our opinion here focuses on those prongs.

■ We have reviewed the record and conclude first that the trial court did conduct the requisite rigorous analysis. It had voluminous written materials before it at the time of the certification hearing. Each party had the opportunity to and did present extensive briefing and evidence addressing all requisite prongs under rule 42. The certification hearing itself consumed two full days and included witness testimony and argument. The trial court actively participated, making inquiries

---

13. This class was crafted to deal with the groundwater contamination claims.

14. Subclasses were defined by location of the property in relation to Leopard Street, and date of acquisition (comparable to the dates identified for the I–37 North Class).

15. Certification of the plaintiff class was appealed and affirmed in August 1996. *See Amerada Hess Corp. v. Garza*, 973 S.W.2d 667, 671, 682 (Tex.App.-Corpus Christi 1996, writ dism'd w.o.j.). *See also Coastal Corp. v. Garza*, 979 S.W.2d 318 (Tex.1998).

where it deemed appropriate to clarify argument and evidence before it. The certification order which ultimately issued did not rest upon pleadings or mere assurances that any problems with predominance or superiority could be overcome, but rather upon extensive analysis. *See Schein*, 102 S.W.3d at 688 (citing *Bernal*, 22 S.W.3d at 435). The subclass structure corresponded to expert testimony and analysis that was in evidence. The court expressly refused to certify claims or a class for medical monitoring, finding that the plaintiff class failed to satisfy its burden in that regard. With respect to property damage claims and diminution in value, it concluded that common issues of fact and law predominated.

We are mindful that rigorous analysis is not complete without an indication of how the claims will likely be tried. *Bernal*, 22 S.W.3d at 435. Here, no express trial plan is included in the trial court's order. The trial court does not expressly identify in the order the causes of action or the substantive issues that will control the case. *See Lopez*, 156 S.W.3d at 557. Nevertheless, we believe that the key information is apparent from the order, which states the plaintiff class is certified only as to property damage claims. The trial court's structure of classes reflects the substantive issues that will control structure of the case and essentially accomplishes the same objectives that would be served by a more express order under *Bernal*. *See Bernal*, 22 S.W.3d at 435. Classes were created to distinguish between air pollution and groundwater pollution. The subclass structure took into account distance from the facilities in question, as well as date of acquisition of property. Each of these factors and subclass structures were based upon concrete evidence and modeling tendered at the certification hearing by the plaintiff expert. The trial court had the opportunity to hear, weigh and reject testimony of defense witnesses that individual questions would predominate over common ones. The trial court could reasonably conclude, as reflected in the structure of subclasses, that common questions would predominate and that individual damage issues could be accounted for by proper modeling and thus would not predominate. Those same divisions would guide how the case was presented to a jury.

We cannot conclude that the trial court's conclusions, based upon an apparent careful and measured examination of the issues and facts before it, constituted an abuse of discretion, even under the auspices of *Bernal*.

We note Justice Hecht's concerns in *Garza*: "If common issues of law and fact did not predominate in *RSR* because of the necessity of proving the damage to each tract by a single pollutant from a single source, they cannot possibly predominate in the present case involving three pollutants from ten sources." *Garza*, 979 S.W.2d at 325 (Hecht, J., dissenting). However, as the majority in that case pointed out, *RSR Corp. v. Hayes*, 673 S.W.2d 928 (Tex.App.-Dallas 1984) involved claims for property damage and personal injury based on pollution from a lead smelter, and was distinguishable from the underlying matter because of the personal injury claims: "[P]ersonal injury mass tort class actions need to be distinguished from property damage class actions. The latter have been more frequently certified and inherently tend to involve both greater homogeneity among class members and greater commonality in their factual issues." *Garza*, 979 S.W.2d at 321 (citing John C. Coffee, Jr., *Class Wars: The Dilemma of Mas Tort Class Action*, 95 Col. L.Rev. 1343, 1344 n. 2 (1995)). The court also noted that the subclass structure crafted by the trial

court in this matter could produce the commonality of issues lacking in *RSR*. *Id.*

██ With respect to superiority, evidence reflects that the members of the plaintiff class below were, for the most part, individuals without resources to bring separate independent suits, and that those suits would raise virtually the same questions and involve the same experts and types of analysis. Evidence reflects that plaintiff class members had an interest in resolving the common issues by class action. Further, the record reflects that plaintiff class members would benefit from discovery already commenced. Much written discovery and many depositions of class representatives and other witnesses, as well as of numerous experts, had already occurred at the time of the certification hearing. The trial court had invested considerable time and effort and was certainly familiar with the issues in dispute. It could reasonably conclude, at the time and on the record before it, that class certification was not only appropriate but also was the superior means by which to address the claims. *See Chastain*, 26 S.W.3d at 34; *Sun Coast Res.*, 967 S.W.2d at 535.

## IV. The Motion to Decertify, Based upon Changed Conditions

### A. The Proceedings and Case Developments

In October 1999, Citgo moved to decertify the plaintiff class based upon changed circumstances. Citgo urged that certification was no longer appropriate for numerous reasons. First, it had conducted the buy-out and secured releases with respect to virtually all properties in the Oak Park Triangle. Citgo and Koch together had purchased an additional 165 properties, paying more than the worth estimated by the plaintiff class damages expert. The purchase of nearly all the Oak Park Triangle subclass properties (which encompassed all of the hydrocarbon groundwater contamination class claims) and an additional 165 properties in the Hillcrest area effectively eliminated all residential properties in close proximity to the facility.[16]

██ Secondly, Citgo urged that case history reflected and plaintiff class counsel had acknowledged that the 1995 subclasses had played no role in the case, and that the plaintiff class had effectively abandoned the subclasses in its prosecution of the suit.[17] Even the plaintiff class damages expert did not base his later-crafted damage models on the geographical subclasses created in the 1995 order. Instead, the plaintiff class expert opined that damages increased on a continuum as distance from the closest facility increased. Further, no-one attempted to use the acquisition date of a property in the defined subclasses for any significant purpose. The plaintiff class expert instead stated that the date a property may have been acquired played no part in his analysis because he could not identify when any diminution occurred;[18] he focused solely

---

16. Citgo pointed out that the buy-out compensated those property owners in amounts in excess of the damages identified by the plaintiff class expert, such that they were entitled to no additional damages, and further provided Citgo with complete releases.

17. We would also note that on January 22, 1998, the plaintiff class moved to dissolve itself, in order to moot the pending interlocutory appeal. That motion was never ruled on

and was withdrawn on July 16, 1998, subsequent to the supreme court's dismissal of the appeal for want of jurisdiction.

18. The expert did acknowledge that the more recent the acquisition, the greater the discount to his estimated purchase price, reflecting diminution up to that date. However, neither the estimated purchase price nor extent of damage was determined by date of acquisition. The expert stated that injuries to

on proximity to facilities. Citgo additionally pointed to the plaintiff class's response to Koch Industries, Inc.'s motion for summary judgment (filed August 20, 1999), in which the plaintiff class stated that the class substructure was solely a judicial creation to attempt to create commonality, but did not reflect reality.[19] The plaintiff class stated:

> Instead that year [1971] is simply one chosen by the Honorable Robert Pate, the trial court judge who was presiding at the time the plaintiffs in this case were certified as a class. In his certification order ... Judge Pate unilaterally created a number of different subclasses based on geography and duration of ownership. Presumably, Judge Pate created the sub-classes in order to enhance commonality or to aid in the calculation of damages, though it is not clear. The plaintiffs never sought the creation of such sub-classes and the certification order does not identify any reasons for their creation.

Third, Citgo urged that inherent conflicts had arisen between plaintiff class members located close to facilities and those located at a further distance, destroying typicality and adequacy of representation. Citgo urged these conflicts arose because when the plaintiff class expert sought to preserve claims of outlying properties, date problems with respect to when substantial damage occurred necessarily triggered statute of limitations concerns for properties in close proximity to the facilities.[20] Additionally, Citgo urged that the combined effect of (a) the expert's opinion as to when "substantial injury" occurred, coupled with (b) application of the expert's own discount rate (based on date of acquisition), and (c) the Citgo buyout, was that numerosity was destroyed. Citgo also pointed to the plaintiff class's admission that plaintiff class members located 1.069 miles or more from the facilities had no loss or damage at all.

Plaintiff class claims also now encompassed a 1997 event involving a fire at Citgo. This event occurred years after certification and did not impact all residences in the plaintiff class in the same manner as earlier claims (based on groundwater contamination and air pollution from aggregate emissions over time) might have done. Further, claims related to the 1997 event had been separately litigated by many in the plaintiff class, and they were now barred by res judicata from resurrecting or recovering again for those

---

the properties became "substantial" over a period between the early 1980's and early 1990's, with the bulk of damages occurring in the mid to late 1990's.

19. The plaintiff class notice as it was proposed in 1999 did not reference any of the subclasses, and referred only to the entire geographical area encompassed within the plaintiff class.

20. Damages for permanent nuisance require a "material or substantial injury." *See Gulf Oil Corp. v. Vestal*, 231 S.W.2d 523, 525 (Tex. Civ.App.-Fort Worth 1950), *aff'd*, 149 Tex. 487, 235 S.W.2d 440, (1951). The plaintiff class urged that a cause of action for permanent nuisance accrued when the property sustained "substantial injury." The plaintiff class damage expert opined that severity of impact on properties directly correlated to distance from the facility, and that by a certain date, "substantial damage" in the amount of 21% diminution in value had occurred to properties within a one-third mile radius of the facility. The expert projected a growth rate for this radius over time. Citgo urged that this approach necessarily meant that, at the time of the hearing, property beyond that radius had not yet sustained the requisite "substantial damage," such that a cause of action had not yet even accrued. Further, the plaintiff class expert conceded that some members of the plaintiff class were so distant from the facility that they had sustained no damages at all.

same claims. Inclusion of that event further complicated proof issues and allocation of damages.[21] Finally, Citgo urged that many plaintiff class members had died since certification, and Texas law prohibits recovery of exemplary damages for injury to real property on behalf of a decedent.

Citgo urged that the various changed circumstances had destroyed any earlier commonality, typicality, adequacy or numerosity. Citgo urged that discovery and progression of theories in the case had exacerbated individual concerns, including when damage became "substantial," and that these concerns necessarily outweighed and predominated over any of the originally-hoped-for common issues.

Appellees disputed Citgo's contentions, conceding only that two factors had changed since the initial certification: some of the plaintiff class had died, and Citgo conducted its buy-out.

A hearing on the motion to decertify was held on November 22, 1999. The plaintiff class essentially argued that trial was set and justice demanded that it go forward as scheduled in January 2000. They urged that Citgo only urged the certification argument as a means to postpone that trial. The motion was denied on November 24, 1999.

In January, trial did not go forward. Instead the trial court approved the Citgo settlement first tendered to the court in fall 1997. In March 2000, the plaintiff class filed an amended petition and included an alternate claim for breach of the settlement agreement.

At a June 2001 pre-trial hearing, the court was again asked to revisit the issue of decertification, in light of *Bernal* and the other changes in circumstances. The court requested additional briefing. On July 6, 2001, Citgo filed a Supplemental Motion to Decertify, stressing the absence of any rigorous analysis, any trial plan, and the failure of the plaintiff class, as defined, to satisfy the requisites of Rule 42.[22] Citgo urged that potential problems had only been exacerbated, the class definition, as certified, precluded Citgo from adequately and vigorously presenting individual defenses,[23] and that certification was not the superior method by which to resolve remaining claims.

The plaintiff class did not respond directly to Citgo's arguments, but urged that the 1995 certification order was still viable, that some members of the Oak Park Triangle subclass had never settled with Citgo, that modification would only trigger another appeal, that modification might adversely affect other pending settlements, that Citgo presented no new arguments, and that the trial court had already determined that individual issues did not predominate.[24] As to the absence of a trial

21. Citgo also argued that numerous members of the plaintiff class had, at different times, been party to various suits against various defendants for other specific incidents, each time claiming property damage and diminished value. While such claims would not necessarily negate the possibility of recovery in this instance, they could impact those members' amount of recovery in light of other recoveries they might have received.

22. In this supplemental motion, Citgo notes that although the original certification order created a subclass of the Oak Park Triangle for alleged groundwater contamination, a rule 11 agreement was later entered into, confirming that such claims would not be asserted against Citgo. Additionally, at the time of this motion, all but one Oak Park Triangle property had been purchased by Citgo in its buy-out.

23. At this point in the litigation, there apparently remained between 2,000 and 3,000 plaintiff class members.

24. The plaintiff class further urged that Citgo's issues would be moot if the plaintiff class prevailed in its claims for breach of the settlement agreement.

plan (as required under *Bernal* ) the plaintiff class urged that the fact that trial proceeded against the severed Coastal Corporation defendants adequately demonstrated that the matter could be tried on the merits and that individual issues would not predominate.[25]

■ A bench trial commenced on August 13, 2001; the trial court did not re-open the hearing, presumably because the entire issue might become moot depending upon outcome of the trial.[26]

## B. Analysis

In our 1996 opinion, in which we reviewed the certification issues for the first time, we noted that "[t]he court has the 'duty of monitoring its class decisions in light of the evidentiary development of the case ... [and] must define, redefine, subclass, and decertify as appropriate in response to file progression of the case from assertion to facts.'" *Amerada Hess v. Garza*, 973 S.W.2d at 673–74.

■ It cannot be disputed that major changes occurred subsequent to the original certification. In addition to the shifts in circumstance identified by the parties is the significant development that Citgo is the only remaining defendant in the underlying proceedings. Any complications that might have previously arisen with respect to multiple defendants and related causation issues are no longer a concern. The resultant simplification of the suit mitigates in favor of retaining certification of the plaintiff class.

However, the Citgo buy-out did occur, with the resultant elimination of most of the Oak Park Triangle Class (formed to address the groundwater contamination issue).[27] We further cannot ignore that the plaintiff class, in its 1999 pleadings, stated that class structure and division into subclasses was simply one chosen by the trial judge and that, while presumably the subclasses were created "in order to enhance commonality or to aid in the calculation of damages," the "plaintiffs never sought the creation of such subclasses and the certification order does not identify any reasons for their creation." The record further reflects that plaintiff class in fact sought to dissolve itself at one point, presumably because it was not an accurate reflection of

**25.** Propriety of the plaintiff class in the severed case and trial against Coastal Corporation is not before us; we note, however, the plaintiff class's acknowledgment that Coastal Corporation also argued that individual issues predominated.

**26.** As noted in our earlier opinion of September 30, 2005, trial proceeded on the claim for breach of the settlement agreement. A hearing on the question of decertification was set prior to trial before a visiting judge. However, an objection to the judge was lodged; the hearing did not go forward. Although the issue was brought up before the trial court, it was not resolved before trial commenced. We reject the contention that the issue was waived. At all points in the process, Citgo raised motions in opposition to the class, and requested either decertification or a new hearing. In April 2002, Citgo objected to the proposed class notice (relating outcome of the

trial); Citgo even brought an interlocutory appeal which was rejected as premature. In September 2002, the court held a hearing on the motion for entry of judgment and attorneys' fees. Following this hearing, the plaintiff class tendered a proposed final judgment to which Citgo objected based upon conflicts in the class and arguments for decertification. Once final judgment issued in April 2003, this appeal ensued.

**27.** This class was defined as "All persons who, as of June 1, 1991, [are] members of the I37 North Residential Property Damage Class and whose real property within that class overlies and/or has been contaminated by the subsurface plume of toxic contaminates which geographical area is not greater than the area of the striped triangle on the Property Damage Class Map in Plaintiff's Exhibit 31".

the evidence that had arisen through continuing discovery and expert analysis. The plaintiff class's own expert did not use the plaintiff class structure defined in the 1995 order to craft his damages analysis. We also cannot ignore the settlements included in the record which, in resolving claims against other co-defendants of Citgo, created distinct settlement classes that do not correspond to the original 1995 certification order or the class definitions set forth therein.

The trial court was presented with motions requesting it to revisit the issue of class certification in light of the many changed circumstances. It held one hearing, denied the motion to decertify, then approved the settlement agreement (which was found to have been abandoned in our September 30 opinion), and ultimately moved forward with trial on the breach of contract claim. Though requested and presented with new motions, the trial court did not hold an additional hearing on decertification prior to trial. We conclude that, in light of the many and dramatic changed circumstances, regardless of whether they are best considered under modification or decertification, the trial court abused its discretion in failing to adequately address the motions to decertify and to conduct the rigorous analysis demanded by *Bernal*.

▮ We note that where problems arise with a class definition, appellate courts should be reluctant to step in or redefine the class. *Beeson*, 22 S.W.3d at 406.

> [U]nder rule 42(c)(1), the trial court may alter, amend, or withdraw class certification at any time before final judgment. For example, the contours of the case may change after discovery is completed and as the parties prepare for trial, necessitating modification of the class definition. Rule 42(c)(1) invests the trial court with the responsibility of managing the class action, and provides it with the tools to respond to changes in the case's development. Prescribing the class definition for the trial court, therefore, interferes with the trial court's discretion to monitor the class.

*Id.* at 407. Further, "the trial court's discretion to define, modify, subclassify, or decertify in response to the case's development counsels in favor of remanding to the trial court when an appellate court identifies definitional problems." *Id.*

### Conclusion

We grant Citgo's motion for rehearing. We expand the holding in our opinion of September 30, 2005, to include remand to the trial court for further consideration and rigorous analysis of the motions to decertify in light of that opinion and the changed circumstances of the case. *Id.*