NUMBER 13-04-00485-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG


 


CHRISTUS SPOHN HEALTH SYSTEM 

CORPORATION, INDIVIDUALLY AND 

D/B/A SPOHN HOSPITAL SOUTH AND 

SPOHN HOSPITAL SOUTH, INDIVIDUALLY , Appellants,


v.
 


LISA MARIE DE LA FUENTE AND REYES

DE LA FUENTE, INDIVIDUALLY AND AS 

NATURAL GUARDIANS AND NEXT 

FRIENDS OF GIOVANI SETH 

DE LA FUENTE, A MINOR, Appellees.

 


On appeal from the 347th District Court of Nueces County, Texas.


 


MEMORANDUM OPINION



Before Chief Justice Valdez and Justices Hinojosa (1) and Garza


Memorandum Opinion by Chief Justice Valdez



 Christus Spohn Health System Corporation, Individually and d/b/a Spohn Hospital
South, and Spohn Hospital South, Individually (collectively "Spohn"), appeal a judgment
resulting from an adverse jury verdict in a medical malpractice case. Plaintiffs below and
appellees and cross-appellants herein, Lisa Marie De La Fuente and Reyes De La Fuente,
individually and as natural guardians of Giovani Seth De La Fuente, a minor, bring a cross
appeal regarding the trial court's application of a settlement credit. We modify the trial
court's judgment to vacate the award of mental anguish damages and, as modified, affirm
the judgment.

I. Background


 Lisa De La Fuente delivered her first child by cesarean section and delivered her
second child vaginally. Lisa anticipated delivering Giovani, her third child, vaginally. Lisa
was admitted to Spohn and treated by Dr. Juan Caceres during her labor with Giovani. 
Lisa's labor was augmented with the drug Pitocin. During labor, Giovani began suffering
variable decelerations in his heartbeat, and Lisa complained of pain and began vomiting. 
After Giovani began experiencing bradycardia, a low heart rate, Dr. Caceres called for an
emergency cesarean section. In the operating room, the nurses could no longer hear
Giovani's heartbeat. Upon performing the cesarean, Dr. Caceres discovered that Lisa had
suffered a ruptured uterus and placental abruption. Giovani was stillborn but was
resuscitated. Giovani suffered profound brain damage from the loss of oxygen caused by
the uterine rupture and placental abruption. At the time of trial, Giovani had cerebral palsy,
could not swallow, suck, or gag, and was being fed through a stomach tube.

 The appellees brought suit against Spohn and Dr. Caceres. Before trial, appellees
entered a high-low settlement with Dr. Caceres. At trial, appellees contended that Spohn
was negligent in, inter alia, (1) over-administering Pitocin to Lisa, resulting in
hyperstimulation of the uterus, resulting in the uterine rupture, (2) caring for Lisa during her
labor, and (3) delaying the cesarean section. The jury found that Spohn was negligent and
Dr. Caceres was not. 

 II. Spohn's Appeal


 Spohn raises eight issues on appeal: (1) the trial court erred in entering judgment
on the verdict when there is legally and factually insufficient evidence to support the jury's
finding that Spohn was negligent or that said negligence proximately caused the injuries
in question, (2) the trial court abused its discretion in denying Spohn's motion to exclude
testimony that Pitocin causes uterine rupture, (3) the trial court erred in entering judgment
on the jury's award of $2,000,000 in mental anguish damages to the De La Fuentes in light
of law barring parents from recovering mental anguish damages for the negligent infliction
of non-fatal injuries to their children, (4) the trial court erred in entering judgment on the
jury's award of $5,000,000 in future medical expenses to the De La Fuentes where there
is legally and factually insufficient evidence to support such damages, (5) the trial court
abused its discretion in denying Spohn's motion to exclude Dr. Alex Willingham's testimony
regarding Giovani's projected life expectancy, (6) the trial court erred in entering judgment
on the jury's award of $675,000 in past medical expenses to the De La Fuentes when there
is legally and factually insufficient evidence to support such damages, (7) the trial court
erred in submitting a broad-form question on liability in the jury charge where the question
improperly allowed the jury to find Spohn liable based on theories of negligence for which
there are legally insufficient evidence, and (8) the trial court improperly applied Spohn's
settlement credit to the jury's award of damages in light of the Texas Supreme Court's
decision in Battaglia v. Alexander requiring settlement credits to be applied to an award of
past damages first.

A. Negligence and Proximate Cause


 In its first issue, Spohn contends that the trial court erred in entering judgment on
the verdict because there is legally and factually insufficient evidence to support the jury's
finding that Spohn was negligent or that such negligence proximately caused the injuries
in question. 

 In reviewing a legal sufficiency challenge, we determine whether the evidence as
a whole rises to a level that would enable reasonable and fair-minded people to differ in
their conclusions. City of Keller v. Wilson, 168 S.W.3d 802, 822 (Tex. 2005). Anything
more than a scintilla of evidence is legally sufficient to support the finding. Leitch v.
Hornsby, 935 S.W.2d 114, 118 (Tex. 1996). More than a scintilla of evidence exists if the
evidence furnishes some reasonable basis for differing conclusions by reasonable minds
about the existence of a vital fact. Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co., 77 S.W.3d
253, 262 (Tex. 2002).

 We view the evidence in the light favorable to the verdict, crediting favorable
evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable
jurors could not. City of Keller, 168 S.W.3d at 827. Evidence is legally insufficient when
the record discloses: (1) a complete absence of evidence of a vital fact; (2) the court is
barred by rules of law from giving weight to the only evidence offered to prove a vital fact;
(3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the
evidence establishes conclusively the opposite of a vital fact. Id. at 810.

 In reviewing a factual sufficiency challenge, we consider and weigh all of the
evidence in support of and contrary to the finding, and will set aside a finding only if it is so
contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly
unjust. Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). In making this review, we do not
substitute our judgment for that of the jury, even if a different answer could be reached on
the evidence. See City of Keller, 168 S.W.3d at 821. It is well established that jurors are
the sole judges of the credibility of the witnesses and the weight to be given to their
testimony. Id. at 819. Therefore, a jury confronted with conflicting evidence may choose
to believe one witness and disbelieve others; it may resolve inconsistencies in the
testimony of any witness; or it may accept lay testimony over that of experts. Id. 

 Plaintiffs in medical negligence cases are required to prove by a preponderance of
the evidence that the allegedly negligent act or omission was a proximate cause of the
harm alleged. See Kramer v. Lewisville Mem'l Hosp., 858 S.W.2d 397, 400 (Tex. 1993).
To establish proximate cause, the plaintiff must prove (1) foreseeability and (2)
cause-in-fact. Leitch, 935 S.W.2d at 118-19. The ultimate standard of proof on the
causation issue "is whether, by a preponderance of the evidence, the negligent act or
omission is shown to be a substantial factor in bringing about the harm and without which
the harm would not have occurred." Park Place Hosp. v. Estate of Milo, 909 S.W.2d 508,
511 (Tex. 1995); see also Arguelles v. U.T. Family Med. Ctr., 941 S.W.2d 255, 258 (Tex.
App.-Corpus Christi 1996, no writ). The precise words of "reasonable medical probability"
are not essential, but evidence of causation must still rise above mere conjecture or
possibility. See Duff v. Yelin, 751 S.W.2d 175, 176 (Tex. 1988); Brownsville Pediatric
Ass'n v. Reyes, 68 S.W.3d 184, 189 (Tex. App.-Corpus Christi 2002, no pet.). The trier of
fact may decide the issue of proximate cause in medical malpractice cases based upon:
(1) general experience and common sense from which reasonable persons can determine
causation; (2) scientific principles provided by expert testimony allowing the fact finder to
establish a traceable chain of causation from the condition back to the event; or (3) a
probable causal relationship as articulated by expert testimony. Columbia Med. Ctr. of Las
Colinas v. Bush, 122 S.W.3d 835, 852-853 (Tex. App.-Fort Worth 2003, pet. denied);
Marvelli v. Alston, 100 S.W.3d 460, 470 (Tex. App.-Fort Worth 2003, pet. denied).

 Spohn asserts that appellees failed to present legally or factually sufficient evidence
that it (1) negligently administered Pitocin and such negligence caused Lisa's uterus to
rupture, or (2) negligently delayed Giovani's delivery and the delay caused his injuries. We
first examine the evidence regarding the alleged delay in Giovani's delivery.

1. Delay


 According to Spohn, Nurse Monica Jarzmik timely called Dr. Caceres to the labor
room at 5:08 p.m., Dr. Caceres had the sole authority to call an emergency cesarean
section, and there was no delay in executing the call for an emergency cesarean. In
contrast, the jury had ample evidence from which it could have found several periods of
delay attributable to Spohn. First, there was some evidence from which the jury could have
concluded that Spohn delayed in failing to identify signs of uterine rupture and failing to
institute the chain of command to institute a cesarean section in a timely manner. Second,
the jury might have concluded that once Dr. Caceres called for an emergency caesarean
section, Spohn delayed both in removing Lisa from the hospital room to the emergency
operating room and in failing to have the emergency operating room prepared for the
surgery.

 The parties presented detailed evidence from multiple witnesses regarding the
events prior to Dr. Caceres's call for the emergency cesarean section. All witnesses
agreed that there is a higher risk for uterine rupture in patients, such as Lisa, who attempt
vaginal births following a birth by cesarean section. In this context, appellees presented
expert testimony that Spohn's nurses over-administered Pitocin to Lisa, failed to recognize
the signs of hyperstimulation in Lisa's uterus, were unaware that Pitocin was associated
with an increased risk of a ruptured uterus in women who were having a vaginal birth after
a cesarean, and failed to identify the signs and symptoms of a ruptured uterus. Further,
Elizabeth Hill-Karbowski, a nurse expert testifying for appellees, testified that a charge
nurse can obtain assistance for a patient if the attending doctor is not available or treating
the patient. Spohn's experts, and nurses, vigorously denied these allegations, but the
testimony for Spohn's witnesses was not uniformly consistent from one witness to the next. 
 With regard to this issue, we would note that the record contains testimony from
which the jury may have inferred that Spohn's records regarding its actions during the labor
process were incorrect, or had been modified after the birth. Specifically, actions detailed
in the nursing notes, such as the application of oxygen and positioning of the patient, are
not substantiated by a videotape taken by a family member during labor. A witness
present during labor testified that she never saw a nurse make annotations on the paper
strip evidencing the fetal heart rate; however, such annotations were later found to be
present. There were discrepancies between events noted on the nursing flow chart and
the fetal monitor strip, particularly with regard to when the Pitocin was turned off. Given
these issues, we would note that the jury is the sole judge of the credibility of witnesses
and the weight to be given to their testimony. Golden Eagle Archery, Inc. v. Jackson, 116
S.W.3d 757, 761 (Tex. 2003). 

 Dr. Caceres arrived in the labor room at 5:16 and attempted a vaginal birth. He
called for an emergency cesarean at 5:38. Within two to three minutes, Dr. Caceres was
in the operating room prepared to begin the operation. He testified that he waited ten to
fifteen minutes before Lisa arrived and the preparations were complete so that he could
begin the caesarean. It took Spohn seven minutes to move Lisa out of the labor and
delivery room, and she did not arrive in the operating room until 5:49, eleven minutes after
Dr. Caceres called for the emergency cesarean. The surgery did not begin until 5:57, eight
minutes after Lisa's arrival in the operating room. Giovani was delivered at 6:00. 

 Dr. Joseph Pasternak, a pediatric neurologist, testified Giovani suffered brain
damage due to a severe hypoxic ischemic insult caused by uterine rupture. He testified
that Giovani had a sustained bradycardia that started at approximately 5:35 and permanent
brain damage began to occur ten to fifteen minutes after the onset of bradycardia. He
testified that the threshold for insult is crossed at approximately eighteen minutes after
onset. He testified that Giovani's injuries started occurring no earlier than 5:45 and
probably at 5:50. 

 Charlotte Young, a nurse mid-wife testifying for Spohn, asserted that, under a
standard promulgated by the American College of Obstetricians and Gynecologists, a
hospital is allowed thirty minutes to perform a cesarean section, and that the nineteen
minute interval in this case fell well within that range. She testified that the failure to have
necessary personnel or instrumentation available could possibly constitute negligence, but
her review of the evidence indicated that the witnesses testified that the operating room
was ready when needed. In contrast, Nurse Jarzmik testified that Spohn was capable of
performing a cesarean in ten minutes. Dr. McBride, Spohn's expert, testified that if you
have anesthesia and a scalpel, you should be able to have a patient delivered in ten
minutes or less. Dr. Caceres stated that he had performed emergency cesareans in eight
to ten minutes. 

 Nurse Lydia Soto testified that she assisted other personnel in moving Lisa from the
labor and delivery room to the operating room. While she testified that Spohn's personnel
were moving as fast as they could getting Lisa out of the labor and delivery room and into
the operating room, she later admitted that she was unaware that Lisa's cesarean was a
"stat" cesarean. Similarly, the hospital's records failed to indicate that this was an
emergency cesarean section. According to Soto, the operating room was ready and set
up, including all required instruments, when she arrived with Lisa, but as discussed in more
detail below, this testimony was contradicted by Dr. Caceres's testimony and Lisa's
discharge summary. She testified that the only remaining task at that point was opening
the sterile packs of instruments. She testified that a scrub tech, Elva Garcia, had trouble
putting her surgical glove on, but this difficulty did not delay the surgery. 

 Nurse Judy Zurawski testified that it took her less than five minutes to prepare the
operating room for surgery.

 The appellees' obstetrics and nursing experts both testified that it was below the
standard of care to take seven minutes to move Lisa out of the labor and delivery room. 
Hill-Karbowski testified that this was an unacceptable period of delay. She testified that
the standard of care on how quickly a c-section needs to be performed is "as soon as
possible." Based on her expertise, based on a reasonable degree of nursing probability,
the standard of care would provide a reasonable amount of time of approximately ten to
twelve minutes. That is, the caesarean should be performed as quickly as possible, or ten
to twelve minutes from decision to delivery at the outside limit. Dr. Schifrin testified that it
should not have taken seven minutes to move Lisa from labor and delivery and eleven
minutes to the operating room. He testified that, under the circumstances, eleven minutes
was an "eternity." 

 Lisa testified that, after Dr. Caceres called for a cesarean section, there were some
nurses present in the labor and delivery room, but they were talking and laughing and
things were moving at a slow pace. Lisa's mother testified that she was in the waiting room
when nurses informed her that Lisa would be having a cesarean. She went in to see Lisa,
and saw two female nurses and one male standing in Lisa's room; they were talking and
laughing. One of the nurses was attempting to untangle wires behind the bed, but dropped
them and said laughingly, "I give up." Lisa's mother testified that she was in the room with
Lisa for "at least" five minutes before Lisa was taken to the operating room. 

 The discharge summary prepared by Dr. Caceres states that:

 Due to the severity of the decelerations and due to the fact that the patient
was complaining of some discomfort in the abdominal wall, we decided to
proceed with emergency cesarean section and due to nonreassuring fetal
heart tones and with the possibility of a ruptured uterus, although there was
no evidence of any external bleeding at this point. Since this moment, we
moved the patient immediately to the c-section room. There was delay in the
c-section due to the fact that the technicians did not have the instruments on
the table like they usually do, ready for the emergency cesarean section, so
we had problems with the technicians trying to get all of the instruments and
the electrocoagulation and all the drapes ready for the caesarean section,
although we were already waiting to proceed with the emergency cesarean
section. Finally, at 6 o'clock we were able to proceed with the emergency
cesarean section, and we delivered the baby. 


The discharge summary thus evidences a period of delay caused by the failure to have the
operating room prepared for surgery. 

 As stated previously, the jury is the sole judge of the credibility of witnesses and the
weight to be given to their testimony. Golden Eagle Archery, Inc., 116 S.W.3d at 761. 
Spohn's nurses generally denied the existence of any delay; however, such testimony
stands in stark contrast to the testimony of Dr. Caceres, appellees' experts, Lisa, and her
mother. Moreover, and saliently, the nineteen minute interval between when the cesarean
was called and executed greatly exceeds the ten minute interval suggested by Spohn's
own witnesses as the duration in which Spohn was capable of performing a cesarean, and
certainly fails to meet the "as quickly as possible" standard suggested at trial. Finally, while
Dr. Caceres indicated at trial that he thought the staff was moving as quickly as possible
in preparing Lisa for surgery, this testimony is contradicted by his own discharge summary
and also by his own testimony that he waited ten to fifteen minutes in the operating room
before he could begin the surgery. Given the foregoing, we conclude that the evidence is
legally and factually sufficient that Spohn's delay proximately caused Giovani's injuries. 
Although this evidence alone is sufficient to support the jury's verdict, we will further
examine the evidence pertaining to Spohn's administration of Pitocin.

2. Pitocin


 Spohn also contends that there is legally and factually insufficient evidence that
Spohn's allegedly negligent administration of Pitocin proximately caused the injuries in
question because, as stated in Spohn's second issue, the trial court erred in admitting
evidence that Pitocin causes uterine rupture. In connection with this allegation, Spohn
contends that: (1) there is no scientific support for the claim that Pitocin causes uterine
rupture, (2) the medical literature and other evidence conclusively establishes that Pitocin
does not cause uterine rupture, and (3) the trial court's failure to exclude testimony that
Pitocin causes uterine rupture probably resulted in the rendition of an improper judgment. 
 Evidentiary rulings are committed to the trial court's sound discretion. Bay Area
Healthcare , Ltd. v. McShane, No. 05-1069, 2007 Tex. LEXIS 527, *5, 50 Tex. Sup. J. 866
(Tex. June 8, 2007); Interstate Northborough P'ship v. State, 66 S.W.3d 213, 220 (Tex.
2001); City of Brownsville v. Alvarado, 897 S.W.2d 750, 753 (Tex. 1995). Even if a trial
court errs by improperly admitting evidence, reversal is warranted only if the error probably
caused the rendition of an improper judgment. Tex. R. App. P. 44.1(a); Nissan Motor Co.
Ltd. v. Armstrong, 145 S.W.3d 131, 144 (Tex. 2004). We review the entire record and
require the complaining party to demonstrate that the judgment turns on the particular
evidence admitted. Nissan Motor, 145 S.W.3d at 144.

 As an initial matter, we would note that Spohn's argument focuses on whether or
not Pitocin causes uterine rupture. The record in this case contained ample evidence,
including medical literature, the package insert for Pitocin, and testimony from multiple
expert witnesses, that the improper administration of Pitocin causes hyperstimulation of
the uterus, which can increase the incidence of uterine rupture, particularly in vaginal births
following c-sections. The record includes no less than fourteen professional articles on this
subject. Even an expert for the defense, Dr. James McBride, testified that, while he does
not agree with the literature and testimony that Pitocin increases the likelihood of uterine
rupture in a vaginal birth after c-section, the injudicious use of Pitocin can perhaps increase
the likelihood of a rupture. 

 Dr. Barry Schifrin testified that the more liberal use of Pitocin, the greater the likely
risk of uterine rupture. Schifrin testified that if you exceed the normal limits or if you have
excessive contractions, there is an increased risk of rupture. He testified that it is well
understood that excessive use of Pitocin predisposes uterine rupture, especially in patients
who have had previous c-sections. He opined that the negligent use of Pitocin was a
proximate cause of the injury to Giovani, and that the prolonged, sustained, and excessive
use of Pitocin predisposed the mother to uterine rupture. 

 Dr. Juan Caceres testified that the nursing staff should have known that
hyperstimulation increases the risk of rupture in a uterus that has a previous scar. Dr.
Richard Munoz, Jr., an expert for Dr. Caceres, testified that a ruptured uterus is associated
with Pitocin and that where there is a previous surgical scar in the uterus, the patient would
be at an increased risk for rupture.

 Other witnesses, such as nurses Charlotte Young and Monica Jarzmik, disagreed
with the proposition that Pitocin is associated with uterine rupture. It was apparent at trial
that Spohn's nursing staff was largely unfamiliar with this concept.

 The package insert for Pitocin states that "Overstimulation of the uterus by improper
administration can be hazardous to both mother and fetus. Even with proper
administration and adequate supervision, hypertonic contractions can occur in patients
whose uteri are hypersensitive to oxtyocin." The insert notes that oxtyocin should not be
administered "in any condition in which there is a predisposition for uterine rupture , such
as previous major surgery on the cervix or uterus including cesarean section . . . ." The
insert notes that maternal deaths due to rupture of the uterus have been reported
associated with usage in induction of labor or augmentation of labor. Over dosage
depends on uterine hyperactivity, whether or not due to hypersensitivity to Pitocin, and
notes that hyperstimulation with strong (hypertonic) or prolonged (tetanic) contractions can
lead to, among other things, uterine rupture.

 We conclude that the trial testimony, and evidence utilized by expert witnesses for
the plaintiffs, was relevant and reliable and was based on reliable foundation evidence. 
The trial court did not abuse its discretion in admitting this evidence.

 Based on the foregoing, we overrule Spohn's first and second issues.

B. Mental Anguish Damages


 In its third issue, Spohn argues that the trial court erred in entering judgment on the
jury's award of $2,000,000 in mental anguish damages to the De La Fuentes in light of law
barring parents from recovering mental anguish damages for the negligent infliction of non-fatal injuries to their children. The jury awarded Lisa Marie De La Fuente $750,000 for past
mental anguish and $375,000 for mental anguish, that in reasonable probability, would be
sustained in the future. The jury awarded Reyes De La Fuente $500,000 for past mental
anguish and $375,000 for mental anguish, that, in reasonable probability, would be
sustained in the future.

 The Da La Fuentes family relies on Birchfield v. Texarkana Memorial Hospital, 747
S.W.2d 361, 364-65 (Tex. 1987), arguing that the supreme court in that case recognized
a parent's entitlement to mental anguish resulting from serious permanent injury to a child
by letting stand the jury's award of that element of damages. Spohn contends that the
supreme court directly addressed and rejected a bystander claim for mental anguish
damages in Edinburg Hospital Authority v. Trevino, 941 S.W.2d 76, 81 (Tex. 1997) (holding
that "Texas's bystander cause of action precludes bystander recovery in medical
malpractice cases"). We agree with Spohn that the appellees' claim is controlled by
Edinburg, which precludes recovery of bystander mental anguish damages in a medical
malpractice case as a matter of law. See id.; Morrell v. Finke, 184 S.W.3d 257, 270 (Tex.
App.-Fort Worth 2005, pet. abated); Denton Regional Med. Ctr. v. LaCroix, 947 S.W.2d
941, 957 (Tex. App.-Fort Worth 1997, writ dism'd by agr.). Accordingly, we sustain
Spohn's third issue.

C. Future Medical Expenses


 In its fourth issue, Spohn contends that the trial court erred in entering judgment on
the jury's award of $5,000,000 in future medical expenses to the De La Fuentes where
there is no or factually insufficient evidence to support such damages. In its fifth issue,
Spohn contends that the trial court abused its discretion in denying Spohn's motion to
exclude Dr. Alex Willingham's testimony regarding Giovani's projected life expectancy.

 The jury awarded $5,000,000 for "[r]easonable expenses of necessary medical care,
facility care, nursing/attendant care, rehabilitation, therapy, hospitalization, equipment and
pharmacy expenses, if any, that in reasonable probability, will be sustained by Giovani
Seth De La Fuente until he reaches the age of 18 years."

 Texas follows the "reasonable probability" rule for future damages for personal
injuries. Fisher v. Coastal Transp. Co., 230 S.W.2d 522, 525 (Tex. 1950); Antonov v.
Walters, 168 S.W.3d 901, 908 (Tex. App.-Fort Worth 2005, pet. denied); Sanmina-SCI
Corp. v. Ogburn, 153 S.W.3d 639, 643 (Tex. App.-Dallas 2004, pet. denied); Columbia
Med. Ctr. of Las Colinas v. Bush, 122 S.W.3d 835, 862-63 (Tex. App.-Fort Worth 2003,
pet. denied); Brownsville Pediatric Ass. v. Reyes, 68 S.W.3d 184, 191 (Tex. App.-Corpus
Christi 2002, no pet.); Rosenboom Mach. & Tool, Inc. v. Machala, 995 S.W.2d 817, 828
(Tex. App.-Houston [1st Dist.] 1999, pet. denied); City of San Antonio v. Vela, 762 S.W.2d
314, 321 (Tex. App.-San Antonio 1988, writ denied). In order to recover for future medical
expenses, the plaintiff must show there is a reasonable probability that such medical
expenses will be incurred in the future. Antonov, 168 S.W.3d at 908; Columbia, 122
S.W.3d at 862-63; Whole Foods Mkt. Southwest v. Tijerina, 979 S.W.2d 768, 781 (Tex.
App.-Houston [14th Dist.] 1998, pet. denied). 

 No precise evidence is required to support an award for future medical costs. 
Tijerina, 979 S.W.2d at 781; Pipgras v. Hart, 832 S.W.2d 360, 366 (Tex. App.-Fort Worth
1992, writ denied). Although the preferred practice for establishing future medical costs
is through expert medical testimony, there is no requirement that the plaintiff establish such
costs through expert testimony. Antonov, 168 S.W.3d at 908; Tijerina, 979 S.W.2d at 781.
The reasonable value of future medical care may be established by evidence of the
reasonable value of past medical treatment. Tijerina, 979 S.W.2d at 781; see Harvey v.
Culpepper, 801 S.W.2d 596, 599 (Tex. App.-Corpus Christi 1990, no writ); City of
Rosenberg v. Renken, 616 S.W.2d 292, 293 (Tex. Civ. App.-Houston [14th Dist.] 1981,
no writ); Thate v. Tex. & Pac. Ry. Co., 595 S.W.2d 591, 601 (Tex. Civ. App.-Dallas 1980,
writ dism'd w.o.j.). The nature of the injury and the plaintiff's condition at the time of trial
are also relevant to determining an award for future medical costs.  Tijerina, 979 S.W.2d
at 781; Pipgras, 832 S.W.2d at 366. The jury can make its determination regarding the
amount of future medical expenses based on the injuries suffered, the medical care
rendered before trial, the progress toward recovery under the treatment received, and the
condition of the injured party at the time of trial. Antonov, 168 S.W.3d at 908; Tagle v.
Galvan, 155 S.W.3d 510, 519 (Tex. App.-San Antonio 2004, no pet.); Rosenboom Mach.
& Tool, Inc., 995 S.W.2d at 828; Vela, 762 S.W.2d at 321. To sustain an award of future
medical expenses, the plaintiff must present evidence to establish that in all reasonable
probability, future medical care will be required and the reasonable cost of that care. 
Rosenboom Mach. & Tool, Inc., 995 S.W.2d at 828. It is within the jury's sound discretion
to determine what amount, if any, to award in future medical expenses. Antonov, 168
S.W.3d at 908; Sanmina, 153 S.W.3d at 643; Colulmbia, 122 S.W.3d at 862-63;
Rosenboom Mach. & Tool, Inc., 995 S.W.2d at 828; Tijerina, 979 S.W.2d at 781. Because
issues such as life expectancy, medical advances, and the future costs of products and
services are, by their very nature, uncertain, appellate courts are particularly reluctant to
disturb a jury's award of these damages. Antonov, 168 S.W.3d at 908; Sanmina, 153
S.W.3d at 643; Brownsville Pediatric Ass'n., 68 S.W.3d at 191. However, this standard of
review is "not so nebulous that a reviewing court will uphold a jury award for future medical
expenses when there is no evidence." Harvey v. Culpepper, 801 S.W.2d 596, 599 (Tex.
App.-Corpus Christi 1990, no writ). 

 Citing Harvey v. Culpepper, 801 S.W.3d 596 (Tex. App.-Corpus Christi 1990, no
writ), Spohn argues that the plaintiff is required to prove future medical expenses based
on "reasonable medical probability" rather than "reasonable probability." Spohn references
the following language in Harvey: "No evidence showed future medical expenses to a
reasonable medical probability." See id. at 599. Spohn contends that this language is
"controlling." We disagree. Reviewing Harvey as a whole, it is clear that Harvey applies
the reasonable probability standard for future damages: 

 The award of future medical expenses is within the discretion of the jury
provided there is a reasonable probability that the expenses will be incurred.
City of San Antonio v. Vela, 762 S.W.2d 314, 321 (Tex. App.-San Antonio
1988, writ denied); Armellini Exp. Lines v. Ansley, 605 S.W.2d 297, 311
(Tex. Civ. App.-Corpus Christi 1980, writ ref'd n.r.e.). The jury may make its
award based on the nature of the injuries, the medical care rendered prior to
trial, and appellee's condition at trial. Vela, 762 S.W.2d at 321.


Id. Other cases from this Court also apply the "reasonable probability" standard. See
Brownsville, 68 S.W.3d at 191; Volkswagen of Am., Inc. v. Ramirez, 79 S.W.3d 113, 128
(Tex. App.-Corpus Christi 2002, rev'd on other grounds, 159 S.W.3d 897 (Tex. 2004); see
also Reliance Steel & Aluminum Co. v. Sevcik, No. 13-03-00407-CV, 2006 Tex. App.
LEXIS 1839, *5 (Tex. App.-Corpus Christi Mar. 9, 2006, pet. filed) (mem. op.). Further,
several of our sister courts have considered and rejected the exact contention that Spohn
is making here, that future medical expenses must be proved by a reasonable medical
probability rather than a reasonable probability. We join those courts in concluding that the
plaintiff is not required to prove future medical expenses based on "reasonable medical
probability." See Antonov, 168 S.W.3d at 908; Columbia, 122 S.W.3d at 864; Furr's Inc.
v. Logan, 893 S.W.2d 187, 194 (Tex. App.-El Paso 1995, no writ).

 Spohn contends that there is no or factually insufficient evidence that: (1) Giovani's
projected life expectancy would support an award of $5,000,000 in future medical
expenses; and (2) even assuming Giovani lived up to 18 years of age, Giovani would have
incurred $5,000,000 in medical expenses. 

 Spohn first asserts that there is no or factually insufficient evidence that Giovani
would have lived beyond five to six years of age. Spohn's experts, Dr. Carol De Line and
Dr. Jerry Tomasovic, testified at trial variously that Giovani's life expectancy would range
from five to six years of age. In deposition testimony, Dr. Tomasovic had originally
estimated that Giovani's life expectancy was seven to ten years of age, but he revised that
estimate following Giovani's hospitalizations the summer prior to trial. 

 In contrast, appellees' expert, Dr. Willingham, testified that Giovani's life expectancy
was an additional thirty-seven years at the time of trial. Spohn contends that Dr.
Willingham's testimony was unreliable and should have been excluded because it was
based on data for persons with spinal cord injuries, rather than individuals in Giovani's
circumstances. Dr. Willingham testified, essentially, that there was not a life expectancy
table for those individuals with the precise brain injury suffered by Giovani, so he utilized
data referable to a "parallel population," that is, individuals with spinal cord injuries, who
have similar medical issues. Willingham's opinion regarding Giovani's life expectancy was
based on the data referable to a parallel population, as well as other criteria. 

 We reject Spohn's contention. First, expert testimony regarding future medical costs
is not required to establish future medical expenses. Second, life expectancy tables are
based upon averages and are not binding upon the jury. Armellini Express Lines, Inc. v.
Ansley, 605 S.W.2d 297, 311 (Tex. App.-Corpus Christi 1980, writ ref'd n.r.e.); Roberts v.
Tatum, 575 S.W.2d 138, 142 (Tex. Civ. App.-Corpus Christi 1978, writ ref'd n. r. e.). 
Moreover, appellees were not required to prove Giovani's life expectancy by a reasonable
medical probability. Columbia, 122 S.W.3d at 864. In fact, such a burden of proof is
impossible because life expectancy, by its very nature is uncertain. See id.; Pipgras, 832
S.W.2d at 365. Accordingly, we reject Spohn's argument. Moreover, given that Giovani
had incurred $500,000 in medical expenses per year for his first two years of life, the jury
may well have concluded that he would incur that same amount annually for a period of
ten years, a duration of time that one of Spohn's own experts testified that Giovani could
survive. 

 In a subissue, Spohn contends that Giovani would not have incurred $5,000,000
in future medical expenses even if he had lived until his eighteenth birthday. According to
Spohn, assuming the testimony of the appellees' experts are taken at face value, their
economics expert testified that Giovani's future medical expenses up to 18 years of age,
adjusted for inflation, would be only $4,300,038. 

 Based on our review of the jury's findings and the record evidence, it appears
evident that the jury rejected both Spohn and appellees' arguments regarding future
medical expenses. Spohn estimated that Giovani would incur only $1,733,712 in future
medical expenses until the age of 15, with each additional year thereafter costing only
$176,135. Spohn also presented evidence that an annuity to fund Spohn's life care plan
to 10 years of age would cost $1,700,000, or $1,966,000 with inflation. But significantly,
Spohn's life care plan excluded any expenses for hospitalizations and also excluded
nursing services for Giovani estimated to cost $162,000 per year. Spohn's life care plan
also failed to include hyperbaric treatment, stem cell treatment, or colostrum. 

 Dr. Willingham testified regarding two different possibilities for Giovani's future care. 
In the first scenario, Giovani would receive care at home until his mother turned 60 years
of age, then he would move to a care center. This scenario would cost $8,973,807.90. 
Under the second scenario, Giovani would receive care at home until he reached 18 years
of age, then he would move to a residential treatment center. This scenario would cost
$9,728,582.68. Dr. McCoin testified that the present day cost of either option to age 18
was $3,979,708, unadjusted for inflation that had occurred since the report was done. The
additional cost past age 18 was either $3,889,582 for the first scenario, or $4,458,165 for
the second. 

 It was undisputed that Giovani suffered severe brain damage causing permanent
and wholly disabling injuries. He required full-time care and his condition rendered him
subject to repeated hospitalizations, even at the time of trial. At the age of two and one-half, Giovani had already incurred over $1,000,000 in medical expenses. Accordingly, the
jury had before it evidence to establish that in all reasonable probability, Giovani would
require future medical care and the reasonable cost of that care. Rosenboom Mach. &
Tool, Inc., 995 S.W.2d at 828. 

 Viewing only the evidence and inferences tending to support the jury's future
medical expenses award and disregarding all evidence and inferences to the contrary, we
hold that the evidence is legally sufficient to support the jury's award of future medical
expenses. See Columbia, 122 S.W.3d at 864; Bradford, 48 S.W.3d at 754; Brownsville
Pediatric Ass'n, 68 S.W.3d at 192; Furr's, Inc., 893 S.W.2d at 194; Pipgras, 832 S.W.2d
at 366. Further, considering all of the evidence, the evidence supporting the jury's future
medical expense award is not so weak, nor is the evidence to the contrary so
overwhelming, that the answer should be set aside and a new trial ordered. See Columbia,
122 S.W.3d at 864; Garza, 395 S.W.2d at 823; Brownsville Pediatric Ass'n, 68 S.W.3d at
192; Furr's, Inc., 893 S.W.2d at 194; Pipgras, 832 S.W.2d at 366. We overrule appellant's
fourth and fifth issues.

D. Past Medical Expenses


 In its sixth issue, Spohn asserts that the trial court erred in entering judgment on the
jury's award of $675,000 in past medical expenses to the De La Fuentes when there is no
or factually insufficient evidence to support such damages. Specifically, Spohn contends
that Dr. Willingham's testimony that the past expenses were reasonable, necessary, and
resulted from Spohn's conduct was not competent or sufficient evidence because Dr.
Willingham's opinion was based on his review of summaries of the medical bills rather than
his review of all of the actual medical bills. 

 We disagree with Spohn's assertion. Under the rules of evidence, the "facts or data
in the particular case upon which an expert bases an opinion . . . may be those perceived
by, reviewed by, or made known to the expert . . . ." Tex. R. Evid. 703. Facts or data need
not be admissible in evidence if "of a type reasonably relied upon by experts" in that
particular field. See id. This Court has previously allowed expert testimony based on
summaries of records even where the summaries themselves were not admissible. See
Welder v. Welder, 794 S.W.2d 420, 429-30 (Tex. App.-Corpus Christi 1990, no writ); see
also Rio Grande Valley Gas Co. v. City of Edinburg, 59 S.W.3d 199, 222-23 (Tex.
App.-Corpus Christi 2000) (rejecting argument that expert's opinion constituted "no
evidence" because it was based on summaries of records), rev'd on other grounds, 129
S.W.3d 74 (Tex. 2003). 

 In the instant case, the De La Fuentes incurred more than $1 million in past medical
expenses. The record contains these medical bills. Dr. Willingham testified that these
costs and expenses were reasonable and necessary and were the result and consequence
of Giovani's brain injury. The jury awarded $675,000 for past medical expenses, less than
the amount actually incurred by appellees. 

 We overrule this issue.

E. Charge Error


 In its seventh issue, Spohn argues that the trial court erred in submitting a broad-form question on liability in the jury charge where the question improperly allowed the jury
to find Spohn liable based on theories of negligence for which there was legally insufficient
evidence. 

 "In all jury cases the court shall, whenever feasible, submit the cause upon
broad-form questions." Tex. R. Civ. P. 277. "It is implicit in this mandate that the jury be
able to base its verdict on legally valid questions and instructions." Crown Life Ins. Co. v.
Casteel, 22 S.W.3d 378, 390 (Tex. 2000). The court's charge must be drafted in order to
enable us "to determine whether properly submitted theories constituted the basis of the
jury's verdict." Id. at 389. Accordingly, when a jury bases a finding of liability on a single
broad-form question that commingles legally invalid theories of liability with legally valid
theories, we are sometimes, but not always, unable to determine the effect of this error. 
Id. at 388. 

 Under this rule from Casteel, when the jury charge is drafted in a manner such that
the jury may have based its finding of "liability solely on one or more . . . erroneously
submitted theories . . . it is impossible for us to conclude that the jury's answer was not
based on one of the improperly submitted theories." Id. at 389 (emphasis added). 
"However, when questions are submitted in a manner that allows the appellate court to
determine that the jury's verdict was actually based on a valid liability theory, the error may
be harmless." Id. (citing City of Brownsville v. Alvarado, 897 S.W.2d 750, 752 (Tex. 1995)
("Submission of an improper jury question can be harmless error if the jury's answers to
other questions render the improper question immaterial."); Boatland of Houston, Inc. v.
Bailey, 609 S.W.2d 743, 749-50 (Tex.1980) (holding that the potentially improper
submission of defensive issues was harmless error when the jury also found for the
defendant on independent grounds)).

 The Texas Supreme Court recently considered expanding this rule from Casteel but
declined to expand the rule:

 Under Casteel and Harris County, we presume that the error was harmful
and reversible and a new trial required when we cannot determine whether
the jury based its verdict solely on the improperly submitted invalid theory or
damage element. Id.; Casteel, 22 S.W.3d at 388. . . . We specifically limited
our holdings in Casteel and Harris County to submission of a broad-form
question incorporating multiple theories of liability or multiple damage
elements. Harris County, 96 S.W.3d at 235; Casteel, 22 S.W.3d at 388. . .
. When, as here, the broad-form questions submitted a single liability theory
(negligence) to the jury, Casteel's multiple-liability-theory analysis does not
apply. 

 

Bed, Bath & Beyond, Inc. v. Urista, 211 S.W.3d 753, 756-57 (Tex. 2006). In the instant
case, the broad-form questions submitted a single liability theory, negligence, to the jury,
and, accordingly, Casteel's multiple-liability-theory analysis does not apply. See id. 

 In addition to the Texas Supreme Court's recent conclusion that "Casteel's
multiple-liability-theory analysis does not apply" when the charge includes a broad-form
submission on a single liability theory, our sister Court of Appeals in El Paso has also
correctly noted that "Casteel does not apply until or unless the party seeking reversal and
remand for charge error makes a 'timely and specific' objection to the inclusion of the
contested question." El Paso Refining, Inc. v. Scurlock Permian Corp., 77 S.W.3d 374,
386 (Tex. App.-El Paso 2002, pet. denied) (op. on reh'g) (citing Casteel, 22 S.W.3d at
389-90). "Under Casteel, remand is only required when a theory should never have been
presented to the jury because there was no valid legal, as opposed to factual, basis for
such submission." El Paso Refining, 77 S.W.3d at 386 (citing Casteel, 22 S.W.3d at 388). 
Accordingly, to preserve any alleged error under Casteel, the objection must "inform the
trial court that this issue was a question of law for the court to resolve." El Paso Refining,
77 S.W.3d at 386. Specifically, when the "only trial objections were that the evidence was
insufficient to permit their submission to the jury, not that the issues were legally barred
from the case," such objections are insufficient to preserve a Casteel complaint. El Paso
Refining, 77 S.W.3d at 386.

 In the instant case, Spohn's objection to the liability question in the jury charge failed
to preserve error on the alleged applicability of Casteel. Spohn objected as follows:

 The only other objection I would have would be to the general submission
simply because the format permits the plaintiffs to argue acts of negligence
on which there is no expert testimony regarding causation. To that extent it
could lead to rendition of [an] improper verdict based on evidence of
negligence on which there is no expert testimony on proximate cause. That
would be our objection to that. 


Spohn's objection that there was no evidence regarding causation was not an objection
that the issue was legally barred, and accordingly, was insufficient to preserve a Casteel
complaint. El Paso Refining, 77 S.W.3d at 386. 

 Even if we were to conclude that Spohn's no evidence objection preserved its
current Casteel complaint, we still could not accept Spohn's argument that the broad-form
negligence question submitted in this case presents a Casteel error. In Casteel, the
court's charge submitted five distinct DTPA-based theories of liability, along with eight other
theories of liability, in a single broad-form question. Id. at 388. Because the plaintiff in
Casteel lacked standing to assert four of the five DTPA theories, the trial court erred by
submitting those legally invalid theories to the jury. Id. The supreme court held that this
error was harmful because the court of appeals could not determine whether the jury
based its verdict on an improperly submitted invalid theory or on a properly submitted valid
theory. Id.

 Casteel applies to multiple theories of liability; by contrast, the instant situation
involves only one. Here, appellees pleaded one theory of liability against Spohn and one
theory of liability against Dr. Caceres: negligence. Within appellees' pleading, appellees
pleaded specific negligent acts by Spohn. But these acts are not separate theories of
liability and do not constitute the assertion of any additional basis for recovery. Id.; 
Formosa Plastics Corp., USA v. Kajima Int'l, Inc., No. 13-02-385-CV, 2006 Tex. App.
LEXIS 11098, 36-38 (Tex. App.-Corpus Christi Dec. 28, 2006, no pet. h.); Columbia, 122
S.W.3d at 859. 

 Moreover, Spohn's reliance on Romero v. KPH Consol., Inc., 166 S.W.3d 212 (Tex.
2005), is also inapposite. Spohn contends that Romero stands for the proposition that
submitting a broad-form jury question that would allow a jury to find liability or damages
based on legally or factually invalid theories is an abuse of discretion. However, the
situation in Romero is distinguishable from the instant situation. The mistake in Romero
was the inclusion of a specific liability question as to malicious credentialing, for which
there was no evidentiary support, coupled with a broad-form apportionment question. See
id. at 214-15. In the instant case, there was one liability question, that of negligence, and
the jury did not apportion responsibility between Spohn and Dr. Caceres. Moreover,
Romero stands for the proposition that the significant benefits of broad-form submission
neither necessitate nor justify misleading the jury with legally or factually invalid claims, and
there is no indication that the jury was misled by this charge. See id. at 215. Accordingly,
Romero does not control our analysis in the instant case.

 Finally, the error of including a factually unsupported claim in a broad-form jury
question is not always reversible. See id. at 227. To be reversible, the erroneous
instruction must have "probably prevented the appellant from properly presenting the case
to the court of appeals." See Tex. R. App. p. 44.1(a)(2); Romero, 166 S.W.3d at 227. On
this record, no issue was erroneously submitted to the jury and, moreover, we are
"reasonably certain that the jury was not significantly influenced by issues erroneously
submitted to it." See Romero, 166 S.W.3d at 227-28. Consequently, even if Casteel
applied in the instant analysis, we would have found that any error in the jury instruction
was harmless. 

 We overrule this issue. 

F. Settlement Credit


 In its eighth issue, Spohn asserts that the trial court improperly applied Spohn's
settlement credit to the jury's award of damages in light of the Texas Supreme Court's
decision in Battaglia v. Alexander requiring settlement credits to be applied to an award of
past damages first. Battaglia v. Alexander, 177 S.W.3d 893, 911-12 (Tex. 2005). Under
Battaglia, decided approximately one year after the judgment in this case was signed,
settlement credits should be applied to past damages first, then to future damages. See
id.; Taveau v. Brenden, 174 S.W.3d 873, 882 (Tex. App.-Eastland 2005, pet. denied). 
Appellees, in contrast, argue that Spohn has failed to preserve this issue for review. 

 In the instant case, Spohn proposed that the trial court apply the settlement credit
proportionally to the award of past and future damages. The trial court followed Spohn's
recommendation. A party cannot complain on appeal that the trial court took a specific
action that the complaining party requested. Tittizer v. Union Gas Corp., 171 S.W.3d 857,
862 (Tex. 2005). Moreover, the fact that Battaglia had not been decided did not relieve
Spohn of its obligation to timely object to the allocation of settlement credits. St. Paul
Surplus Lines Ins. Co. v. Dal-Worth Tank Co., 974 S.W.2d 51, 53 (Tex. 1998). Even
though Battaglia was not yet the law, Spohn was obliged to lodge a timely objection to
preserve error. See id. 

 We overrule this issue. 

III. De La Fuentes's Appeal


 The De La Fuentes raise one issue on appeal: the trial court erred in approving their
settlement agreement with Dr. Caceres and reducing the damages awarded against
Spohn. 

 On December 8, 2003, the De la Fuentes and Dr. Caceres entered into a settlement
agreement. Under the pertinent terms of that agreement, if the jury found Dr. Caceres
negligent at trial, he would pay the De la Fuentes $200,000 plus his share of taxable costs,
but if the jury failed to find him negligent, he would pay $100,000 without taxable costs. 
Dr. Caceres informed the trial court of the settlement both prior to trial and at the start of
the trial. Appellees did not object on either occasion. According to the record, counsel for
appellees expressly told Spohn that approval of the settlement by a guardian ad litem was
not necessary. 

 The jury did not find Dr. Caceres negligent, and, accordingly, the settlement was for
the amount of $100,000. Spohn had elected a sliding scale settlement credit and this
$100,000 settlement resulted in a $1,825,000 settlement credit. 

 Following the verdict, the De La Fuentes argued that the settlement was invalid
because the terms of the settlement had not been approved by a guardian ad litem. The
trial court subsequently appointed an ad litem on March 31, 2004, well after the jury's
verdict. The ad litem concluded that the settlement agreement was not in Giovani's best
interests and would not recommend approval of the settlement. The trial court
nevertheless concluded that the settlement agreement was in the best interests of the
minor at the time it was made, and, accordingly, enforced the settlement. 

 The De La Fuentes assert that the trial court should have examined whether the
settlement was in the best interest of the minor at the time it was presented to the court for
approval rather than at the time the settlement was made. They assert no authority for this
proposition.

 Public policy favors agreements to resolve legal disputes through voluntary
settlement procedures. Jack B. Anglin Co. v. Tipps, 842 S.W.2d 266, 267 (Tex. 1992).
The law favors settlement of disputes and the prevention of litigation, and therefore
"compromise of doubtful and conflicting rights and claims is not only good and sufficient
consideration to uphold an agreement, but it is highly favored in law." Citgo Ref. & Mktg.
v. Garza, 187 S.W.3d 45, 61 (Tex. App.-Corpus Christi 2005, pet. abated) (quoting 
McDonough v. First Nat'l Bank, 34 Tex. 309, 320 (1871)). The determination of whether
a settlement agreement is in a minor's best interests is reviewed for abuse of discretion. 
See Texas Employers Ins. Ass'n v. Grimes, 269 S.W.2d 332, 335 (Tex. 1954). 

 Based on the circumstances herein, we cannot conclude that the trial court abused
its discretion in enforcing the settlement agreement. We overrule this issue.

IV. Conclusion


 We overrule Spohn's first, second, fourth, fifth, sixth, seventh and eighth issues. 
We sustain Spohn's third issue and modify the trial court's judgment to vacate the award
of mental anguish damages. We overrule the sole issue presented by appellees in their
cross-appeal. As modified, we affirm the judgment. 


 ______________________

 ROGELIO VALDEZ,

 Chief Justice



Memorandum Opinion delivered and filed 

this the 16th day of August, 2007.

 

1. Justice Federico G. Hinojosa, Jr., whose term ended on December 31, 2006, not participating.